SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
WALTER W. NOSS (CA 277580)
wnoss@scott-scott.com
JOHN T. JASNOCH (CA 281605)
jjasnoch@scott-scott.com
707 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)

SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
JUDITH S. SCOLNICK
jscolnick@scott-scott.com
THOMAS L. LAUGHLIN IV
tlaughlin@scott-scott.com
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174-4099
Telephone:  212/223-6444
212/223-6334 (fax)

*Counsel for Plaintiffs*
*City of Birmingham Relief &*
*Retirement System*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM, Individually and Derivatively on Behalf of Nominal Defendant INTUITIVE SURGICAL, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> GARY S. GUTHART, LONNIE M. SMITH, CRAIG H. BARRATT, PH.D., ERIC H. HALVORSON, AMAL M. JOHNSON, ALAN J. LEVY, PH.D., FLOYD D. LOOP, M.D., MARK J. RUBASH, GEORGE J. STALK, JR., and MARSHALL L. MOHR, <br><br> Defendants. <br><br> And <br><br> INTUITIVE SURGICAL, INC., <br><br> Nominal Defendant. | No. <br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br><br> JURY DEMANDED |

Plaintiff City of Birmingham Relief and Retirement System ("Plaintiff"), by and through its undersigned counsel, derivatively on behalf of Nominal Defendant Intuitive Surgical, Inc. ("Intuitive" or the "Company"), submits this Verified Shareholder Derivative Complaint and alleges as follows upon Plaintiff's personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, developed from the investigation and analysis by Plaintiff's counsel, including a review of ████████████████████████████████ ████████████████ obtained from Intuitive pursuant to §220 of Delaware General Corporation Law, 8 *Del. C.* §220 ("Section 220 Materials"), a review of publicly available information, including filings by Intuitive with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, Food and Drug Administration ("FDA") 483 letters and warning letters, publicly available filings in lawsuits, and matters of public record.

## INTRODUCTION

1.     This is a shareholder derivative action brought in the right, and for the benefit of Intuitive against certain of its officers and all of its directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties of loyalty and good faith that occurred from at least October 2010 and have caused substantial harm to Intuitive.

2.     Intuitive is a medical device company engaged in the manufacture, sale and servicing of a robotic-controlled surgery device. Its sole product is the da Vinci Surgical System ("da Vinci"), which is responsible for 100% of the Company's revenues and profits since the Company's inception.

3.     As a medical device company, Intuitive is subject to extensive regulation by the FDA. The FDA is the regulatory agency with, among other things, authority to approve Intuitive's requests for expanded applications and new uses of the da Vinci.  Obtaining regulatory approvals from the FDA for additional surgical procedures permitted to be performed by the da Vinci medical device is a highly important business goal for the growth of Intuitive.

4.     The FDA's regulatory oversight of medical device companies also includes overseeing compliance with Medical Device Reporting ("MDR") regulation, 12 C.F.R. Part 803.

1   Under this regulation, whenever a manufacturer of a medical device learns of a complication

2   caused by use of its device, or an adverse event including serious injury or death to a patient

3   from the device, it must make a report of such event to the FDA.  The FDA uses the MDRs that

4   medical device manufacturers are mandated to file, to track adverse events, deaths and product

5   malfunctions of medical devices in order to protect the public's health by taking steps to correct

6   and prevent such malfunctions and adverse events in the future.  The MDR reporting system is a

7   key component of the FDA's ability to protect the public from medical devices that require

8   correction or recall.

9           5.      In addition to the MDR reporting system, FDA regulation requires that medical

10  device manufacturers report any voluntary recall of a product that is initiated by the

11  manufacturer.  This requirement is also designed to keep the FDA informed of any problems

12  with medical devices so the agency can carry out its congressionally mandated task of ensuring

13  that medical devices approved for use by the American public are safe.

14          6.      Each of the Defendants, constituting the entire Board of Directors of Intuitive (as

15  well as Chief Financial Officer, Defendant Marshall Mohr), knowingly, consciously and

16  callously breached their fiduciary duty of loyalty owed to the Company by failing to make a

17  good-faith effort to ensure that Intuitive complied with applicable laws and FDA regulations

18  governing the safety of medical devices designed to protect the health of the American public.

19          7.      Putting the interest of short-term gain ahead of their unconditional duty as

20  directors of a Delaware corporation to steadfastly and in good faith endeavor to comply with the

21  law, the Defendants caused the Company to (i) grossly underreport adverse events and

22  complications caused by da Vinci; (ii) mischaracterize the events that it did report by improperly

23  classifying many events as in the benign category of "other," rather than as a "serious injury" or

24  even "death"; (iii) concealing from the FDA at least three voluntary recalls the Company

25  instigated to warn hospitals about the tendency of a part of the da Vinci device, known as the

26  "Tip Cover," to malfunction, resulting in burning of the patient's internal tissue.

27          8.      Not until the FDA insisted to Intuitive executives at a meeting in September 2012

28  did Intuitive begin to properly report and classify the adverse events and complications

1   experienced by patients undergoing surgery by use of da Vinci, in accordance with the MDR

2   regulations.   Accordingly, when Intuitive began to properly record such events, after its

3   September 2012 meeting with the FDA, the Company's MDR filings began to skyrocket.

4        9.     Subsequently, in January 2013 the FDA, which was now understandably

5   suspicious of Intuitive's manipulation of MDR filings, launched a probe of the safety of da Vinci

6   by questioning surgeons directly regarding their experiences with da Vinci surgery.  When news

7   of this federal probe was revealed to investors in a *Bloomberg* article on February 28, 2013,

8   Intuitive stock tumbled from $573 to $510 per share.

9        10.     Beginning at least in October 2010 the Defendants were made aware of quality

10  issues regarding the da Vinci.  More specifically, the da Vinci utilized a targeted electrical

11  charge to cut and cauterize a patient's tissue during surgery.  A rubberized tip known as the "Tip

12  Cover" was placed at the end of the surgical scissors to ensure that the electrical energy would

13  not leak into parts of the patient's body that were not intended to be cut.  The Defendants were

14  made aware that the Tip Covers that were designed for certain types of da Vinci surgical scissors

15  – the EndoWrist Hot Shears Monopolar Curved Scissors – had a tendency to develop

16  microcracks, causing inadvertent burning of the patient's internal tissues and organs.

17       11.     The Defendants were made aware that Intuitive issued several recalls to hospitals

18  that had purchased the da Vinci, alerting them to the quality issue regarding the Tip Covers.

19  However, in violation of the Federal Food, Drug & Cosmetic Act ("FFDCA") and regulations

20  promulgated by the FDA thereunder, the Defendants permitted Intuitive to conceal these recalls

21  from the FDA.

22       12.     On July 16, 2013, the FDA issued Intuitive a Warning Letter arising from

23  Intuitive's numerous violations of the FFDCA and regulations, including the Company's

24  concealment of several recalls from the FDA and for promoting "a risk to health posed by the [da

25  Vinci] device."  As a result of this news, Intuitive's stock price decreased by $28.81 on July 19,

26  2013, to close at $392.67, a drop of almost 7%.

27       13.     In addition to Defendants' breach of their fiduciary duty of loyalty by their failure

28  to try in good faith to comply with applicable laws concerning patient health and safety, the

1  Defendants also knowingly approved false and misleading statements that were issued by the

2  Company, Defendants Guthart and Mohr in violation of the U.S. securities laws.  Defendants'

3  breaches of their fiduciary duties have caused Intuitive substantial harm, resulted in the filing of

4  a securities class action before this Court, *Abrams v. Intuitive Surgical, et al.*, No. 13-cv-01920

5  (N.D. Cal.), and caused the Company to incur millions of dollars in lost market value, and

6  millions of dollars in legal fees.

7          14.     In addition to the other breaches of fiduciary duty, the Defendants allowed the

8  Insider Trading Defendants, Guthart, Mohr and Smith, to engage in over $113 million of insider

9  trades.  These three Insider Trading Defendants were permitted to sell massive percentages of

10  their holdings in Intuitive during a period where the stock was trading at an artificially inflated

11  value because the Insider Trading Defendants knew, based on their proprietary information, that

12  investors would soon learn of the Company's quality and safety issues with da Vinci and

13  regulatory issues with the FDA arising from the suppression of the quality and safety issues.

14          15.     Since Intuitive remains under the control and/or sufferance of the primary

15  wrongdoers, namely the Board of Directors who (1) have made decisions in violation of the

16  business judgment rule, and (2) are implicated in the commission of the wrongful conduct

17  alleged herein, Intuitive is unable to protect itself or remedy the wrongs inflicted upon it.

18  Accordingly, this derivative action must be brought and vigorously prosecuted to protect and

19  vindicate the rights of Intuitive.

20          16.     This action seeks restitution, damages, and disgorgement to Intuitive and from

21  Defendants for their breaches of fiduciary duty, corporate governance reforms to prevent such

22  practices from recurring, and costs and attorneys' fees.

23                              **JURISDICTION AND VENUE**

24          17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

25  §1332(a)(2), because Plaintiff and Defendants are citizens of different states and the matter in

26  controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to

27  confer jurisdiction on a court of the United States, which it would not otherwise have.

28

18.     The Court has personal jurisdiction over each Defendant because each Defendant has committed acts within and/or targeted at the District, which are related to the claims at issue in this Complaint. Personal jurisdiction is also proper because Defendants conducted business within the District.

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and 28 U.S.C. §1401 because Nominal Defendant Intuitive is headquartered in this District and a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.

## PARTIES

**Plaintiff**

20.     Plaintiff City of Birmingham Relief and Retirement System is a domestic entity located in Jefferson County, Alabama. Plaintiff is currently a shareholder of Intuitive and has continuously held its shares since June 2007.

**Nominal Defendant**

21.     Nominal Defendant Intuitive is a corporation incorporated under the laws of Delaware with its principal place of business in Sunnyvale, California. The Company's stock is traded on NASDAQ under ticker symbol "ISRG."

**The Individual Defendants**

22.     As of the date of this Complaint, Intuitive has a nine-member Board, all of whom are Individual Defendants in this action. In addition, Intuitive's Chief Financial Officer, Marshall L. Mohr, is a Defendant.

**Gary S. Guthart**

23.     Defendant Gary S. Guthart ("Guthart") joined Intuitive in 1996, was promoted to President in 2007, and has served as Intuitive's Chief Executive Officer ("CEO") since January 2010. Guthart is also a member of Intuitive's Board of Directors. Upon information and belief, Guthart is a citizen of California.

24.     ████████████████████████████████████████████████

████████████████████████████████████████████████

1 ███████████████████████████████████████████████

2 ██████████████████████████████████████. In addition, by

3 failing to timely and properly report to the FDA adverse events caused by the da Vinci, and by

4 concealing from the FDA that the Company initiated recalls of defective accessories or services

5 of the da Vinci, Guthart ensured that the Company systematically violated the FDA's reporting

6 regulations, and allowed the Company to suffer severe reputational harm by failing to alert the

7 FDA of inherent dangers of its medical device product.

8      25.    As indicated in Intuitive's most recent proxy, filed March 7, 2014, Guthart did not

9 qualify as an "independent" director under the guidelines set forth by NASDAQ.

10      26.    In 2013, Guthart received $2,466,785 in total compensation from the Company,

11 with the vast majority comprised of stock options. Guthart received a cash salary of $500,000.

12 The remaining $1,906,785 was comprised of stock options. As indicated in Intuitive's most

13 recent proxy, Guthart owns 295,958 shares of common stock, including 37,653 shares directly

14 owned and 281,899 shares issuable pursuant to options exercisable within 60 days of December

15 31, 2013.

16      27.    Guthart began selling in earnest in April 2012, ultimately selling more than $8

17 million of his Intuitive holdings.

18      **Lonnie M. Smith**

19      28.    Defendant Lonnie M. Smith ("Smith") joined Intuitive as CEO in June 1997.

20 Smith resigned from his position as CEO in January 2010, but remains, and has remained from

21 October 2010 to the present, Chairman of the Board as well as an executive officer of the

22 Company. Upon information and belief, Smith is a citizen of California.

23      29.   ██████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ███████████████    In addition, by consciously disregarding Intuitive's statutory and

1    regulatory obligations to fairly and promptly report MDRs and Company-initiated recalls to the

2    FDA, Smith ensured that the Company systematically violated the FDA's reporting regulations,

3    and allowed the Company to suffer severe reputational harm by failing to alert the FDA of

4    inherent dangers of its medical device product.

5        30.    As indicated in Intuitive's most recent proxy dated March 7, 2014, Smith did not

6    qualify as an "independent" director under the guidelines set forth by NASDAQ.

7        31.    In 2013, Smith received $445,019 in total compensation from the Company, with

8    the vast majority comprised of stock options. Smith received an option to purchase 3,000 shares

9    of the Company's common stock granted on April 25, 2013, with an exercise price of $483.80

10   per share. As indicated in Intuitive's most recent proxy, Smith owns 424,358 shares of common

11   stock, including 13,000 shares held by Smith Family Foundation, 157,143 shares held by Lonnie

12   & Cheryl Smith Community Property, 12,513 shares in GRAT 7; 19,245 [sic] shares in GRAT 8;

13   30,000 [sic] shares in GRAT 9; 3,183 [sic] shares in GRAT Paylink, 3,490 shares held in the

14   Lonnie M. Smith Heartflow GRAT; 5,000 shares held in Lonnie M. Smith TDC GRAT; 30,000

15   shares held in the Lonnie M. Smith Equalization GRAT; 30,000 shares held by McKram

16   Investors on behalf of Lonnie & Cheryl Smith; 15,000 shares held by McKram Investors II on

17   behalf of Lonnie and Cheryl  Smith; 7,000 shares held in Charitable Remainder Trust;, 27,206

18   shares held directly by Lonnie Smith, as well as 21,578 shares issuable pursuant to options

19   exercisable within 60 days of December 31, 2013.

20       32.    During the Relevant Period,[1] Smith sold close to $100 million in holdings.

21       **Craig H. Barratt, Ph.D.**

22       33.    Defendant Craig H. Barratt, Ph.D. ("Barratt") joined the Board of Intuitive in

23   April 2011. Barratt is currently a member of the Governance and Nominating Committee. Upon

24   information and belief, Barratt is a citizen of California.

25       34.    ████████████████████████████████████████████████████

26   █████████████████████████████████████████████████████████████████

27

28

---

[1] The "Relevant Period" for insider trading purposes is February 6, 2012 through July 18, 2013.

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████. In

3 addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and

4 promptly report MDRs and Company-initiated recalls to the FDA, Barratt ensured that the

5 Company systematically violated the FDA's reporting regulations, and allowed the Company to

6 suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical

7 device product.

8     35.    In 2013, Barratt received $297,389 in total compensation from the Company, with

9 the vast majority comprised of stock options. Barratt received $53,000 in cash and an option to

10 purchase 2,125 shares of the Company's common stock, granted on April 25, 2013 with an

11 exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy, Barratt owns

12 10,583 shares of common stock, including 1,000 shares held by Barratt-Oakley Trust dated

13 November 29, 2004, of which Mr. Barratt serves 35 of them as a trustee and has voting and

14 investment authority over the shares held by the trust, as well as 9,583 shares issuable pursuant

15 to options exercisable within 60 days of December 31, 2013.

16                     **Eric H. Halvorson**

17     36.    Defendant Eric H. Halvorson ("Halvorson") joined the Board of Intuitive in June

18 2003. Halvorson is currently Chair of the Compensation Committee and a member of the Audit

19 Committee. Upon information and belief, Halvorson is a citizen of California.

20     37.    ███████████████████████████████████

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 █████████████████ In addition, by consciously disregarding Intuitive's statutory and regulatory

25 obligations to fairly and promptly report MDRs and Company-initiated recalls to the FDA,

26 Halvorson ensured that the Company systematically violated the FDA's reporting regulations,

27 and allowed the Company to suffer severe reputational harm by failing to alert the FDA of

28 inherent dangers of its medical device product.

38.     In 2013, Halvorson received $309,389 in total compensation from the Company, with the vast majority comprised of stock options. Halvorson received $65,000 in cash and an option to purchase 2,125 shares of the Company's common stock, granted on April 25, 2013 with an exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy, Halvorson owns 8,809 shares of common stock, including 1,871 shares directly owned and 6,938 shares issuable pursuant to options exercisable within 60 days of December 31, 2013.

**Amal M. Johnson**

39.     Defendant Amal M. Johnson ("Johnson") joined the Board of Intuitive in April 2010. Johnson is currently a member of the Compensation Committee. Upon information and belief, Johnson is a citizen of California.

40.     ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ In addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and promptly report MDRs and Company-initiated recalls to the FDA, Johnson ensured that the Company systematically violated the FDA's reporting regulations, and allowed the Company to suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical device product.

41.     In 2013, Johnson received $297,389 in total compensation from the Company, with the vast majority comprised of stock options. Johnson received $53,000 in cash and an option to purchase 2,125 shares of the Company's common stock, granted on April 25, 2013 with an exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy, Johnson owns 14,750 shares of common stock, including 2,000 shares directly owned and 12,750 shares issuable pursuant to options exercisable within 60 days of December 31, 2013.

**Alan J. Levy, Ph.D.**

42.     Defendant Alan J. Levy, Ph.D. ("Levy") joined the Board of Intuitive in 2000. Levy is currently Chairman of the Governance and Nominating Committee and a member of the

1   Compensation Committee. Upon information and belief, Levy is a citizen of Washington.

2   43. ████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████. In

6   addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and

7   promptly report MDRs and Company-initiated recalls to the FDA, Levy ensured that the

8   Company systematically violated the FDA's reporting regulations, and allowed the Company to

9   suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical

10  device product.

11  44.     In 2013, Levy received $307,389 in total compensation from the Company, with

12  the vast majority comprised of stock options. Levy received $63,000 in cash and an option to

13  purchase 2,125 shares of the Company's common stock, granted on April 25, 2013 with an

14  exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy, Levy owns

15  15,051 shares of common stock, including 2,213 shares directly owned and 13,438 shares

16  issuable pursuant to options exercisable within 60 days of December 31, 2013.

17          **Floyd D. Loop, M.D.**

18  45.     Defendant Floyd D. Loop, M.D. ("Loop") joined the Board of Intuitive in 2005.

19  Loop is currently a member of the Governance and Nominating Committee. Upon information

20  and belief, Loop is a citizen of Ohio.

21  46. ████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████. In

25  addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and

26  promptly report MDRs and Company-initiated recalls to the FDA, Loop ensured that the

27  Company systematically violated the FDA's reporting regulations, and allowed the Company to

28  suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical

1  device product.

2       47.    In 2013, Loop received $297,389 in total compensation from the Company, with

3  the vast majority in comprised of stock options. Loop received $53,000 in cash and an option to

4  purchase 2,125 shares of the Company's common stock, granted on April 25, 2013 with an

5  exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy, Loop owns

6  22,688 shares of common stock, including 22,688 shares issuable pursuant to options exercisable

7  within 60 days of December 31, 2013.

8            **Mark J. Rubash**

9       48.    Defendant Mark J. Rubash ("Rubash") joined the Board of Intuitive in October

10  2007. Rubash is currently Chairman of the Audit Committee. Rubash is considered an "Audit

11  Committee Financial Expert," as defined in Item 407(d)(5)(ii) of Regulation S-K. Upon

12  information and belief, Rubash is a citizen of California.

13       49.    ████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████ In

17  addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and

18  promptly report MDRs and Company-initiated recalls to the FDA, Rubash ensured that the

19  Company systematically violated the FDA's reporting regulations, and allowed the Company to

20  suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical

21  device product.

22       50.    In 2013, Rubash received a $309,389 in total compensation from the Company,

23  with the vast majority comprised of stock options. Rubash received $65,000 in cash and an

24  option to purchase 2,125 shares of the Company's common stock, granted on April 25, 2013

25  with an exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy,

26  Rubash owns 23,448 shares of common stock, including 10 shares directly owned and 23,448

27  shares issuable pursuant to options exercisable within 60 days of December 31, 2013.

28            **George J. Stalk, Jr.**

51.     Defendant George J. Stalk, Jr. ("Stalk") joined the Board of Intuitive in 2007. Stalk is currently a member of the Audit Committee. Upon information and belief, Stalk is a citizen of Toronto, Canada.

52.     ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and promptly report MDRs and Company-initiated recalls to the FDA, Stalk ensured that the Company systematically violated the FDA's reporting regulations, and allowed the Company to suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical device product.

53.     In 2013, Stalk received $299,389 in total compensation from the Company, with the vast majority comprised of stock options. Stalk received $55,000 in cash and an option to purchase 2,125 shares of the Company's common stock, granted on April 25, 2013 with an exercise price of $483.80 per share. As indicated in Intuitive's most recent proxy, Stalk owns 8,438 shares of common stock, including 8,438 shares issuable pursuant to options exercisable within 60 days of December 31, 2013.

**Marshall L. Mohr**

54.     Defendant Marshall L. Mohr ("Mohr") joined Intuitive as Senior Vice President and Chief Financial Officer in March 2006. Upon information and belief, Mohr is a citizen of California.

55.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In addition, by consciously disregarding Intuitive's statutory and regulatory obligations to fairly and promptly report MDRs and Company-initiated recalls to the FDA, Mohr ensured that the

Company systematically violated the FDA's reporting regulations, and allowed the Company to suffer severe reputational harm by failing to alert the FDA of inherent dangers of its medical device product.

56.     In 2013, Mohr received $1,916,828 in total compensation from the Company, with the vast majority comprised of stock options. Mohr received a cash salary of $391,400. The remaining $1,525,428 was comprised of stock options. As indicated in Intuitive's most recent proxy, Mohr owns 90,271 shares of common stock, including 1,320 shares directly owned and 88,951 shares issuable pursuant to options exercisable within 60 days of December 31, 2013.

57.     Through the Relevant Period, Mohr sold almost $15 million of his total holdings.

58.     All the Board member Defendants, Guthart. Smith, Barratt, Halvorson, Johnson, Levy, Loop, Rubash and Stalk will hereinafter be referred to as the Director Defendants. Defendants Guthart, Mohr and Smith will be referred to as the Insider Trading Defendants.  All Director Defendants and Defendant Mohr will hereinafter be referred to as Individual Defendants, or simply as Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

59.     By reason of their positions as officers and/or directors of Intuitive, and because of their ability to control the business and corporate affairs of Intuitive, the Defendants owed Intuitive and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Defendants to use their utmost abilities to control and manage Intuitive in an honest and lawful manner. The Defendants were and are required to act in furtherance of the best interests of Intuitive and its investors. Each director of the Company owes to Intuitive and its investors the fiduciary duty to exercise loyalty, good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

60.     Because of their positions of control and authority as directors and/or officers of Intuitive, Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive, managerial and directorial positions with Intuitive, each of the Defendants have access to adverse, non-public information

1    about the financial condition, operations and future business prospects of the Company.

2        61.    Delaware law requires that each member of the Board of Directors of a Delaware

3    corporation attempt in good faith with regard to each corporate action (or non-action) to comply

4    with existing statutory, regulatory and common law. As the Delaware Chancery Court stated,

5    "Delaware corporate law has long been clear on this rather obvious notion; namely that it is

6    utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the

7    corporation to act unlawfully." *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007).

8    Reflecting this bedrock principal of Delaware law, the Company's Board Committee charters, as

9    well as its Code of Business Conduct and Corporate Governance Guidelines, require Intuitive's

10   Board of Directors to ensure that the Company does not violate laws and regulations.

11       62.    By virtue of these duties, Defendants were required, among other things, to:

12           (a)    Endeavor in good faith to ensure the Company's compliance with its
                    legal obligations and requirements;

13           (b)    Remain informed as to how Intuitive conducted its operations, and
14                  upon receipt of notice or information of imprudent or unsound
                    conditions or practices, make reasonable inquiries in connection
15                  therewith, and take steps to correct such conditions or practices;

16           (c)    Endeavor in good faith to ensure that the Company was operated in a
                    diligent, honest, and prudent manner in compliance with all applicable
17                  federal, state, and local laws, rules and regulations;

18           (d)    Establish and maintain systematic and accurate records and reports of
                    the business and internal affairs of Intuitive and procedures for the
19                  reporting of the business and internal affairs to the Board, and to
                    periodically investigate, or cause independent investigation to be
20                  made, of said reports and records;

21           (e)    Maintain and implement an adequate and functioning system of
                    internal legal, financial and operational controls, such that Intuitive's
22                  information disseminated to the public would be accurate and the
                    actions of its directors would be in accordance with all applicable law;
23
24           (f)    Exercise reasonable control and supervision over the public statements
                    to the securities markets, investors and public shareholders of Intuitive
                    by its officers and employees; and
25
26           (g)    Preserve the assets of Intuitive even if to the detriment of their fellow
                    executives and directors of Intuitive.

27       63.    The conduct of the Defendants complained of herein involves a knowing and

28   culpable violation of their obligations as directors and officers of Intuitive, the absence of good

faith on their part, and a reckless disregard for their duties to the Company and its investors that the Defendants were aware posed a risk of serious injury to the Company.

64.     In carrying out their unlawful schemes, Defendants committed clear breaches of their fiduciary duties to the Company. As members of Intuitive's Board of Directors, Defendants were held to the "highest standards of business conduct," and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records. It was the Board's responsibility to ensure that the Company made "full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all documents that ISI files with, or submits to the Securities and Exchange Commission and in all other public communications made by ISI." The Board was required to "monitor management's and the Company's performance, and provide [] advice and counsel to management." In fulfilling its role in risk oversight of the Company, the Board was required to "discuss[] the Company's risk exposures and risk management of various parts of the business, including appropriate guidelines and policies to minimize business risks and major financial risks and the steps management has undertaken to control them."

65.     Further, Board members were prohibited from trading on material non-public information including "any information that is not known to the general public and a reasonable investor would consider important in a decision to buy, hold, or sell securities."

66.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

67.     The name of each person and/or entity who is responsible for, participated in, conspired to bring about, or substantially and knowingly aided and abetted the self-dealing and illegal actions complained of herein, is set forth in the caption of this Complaint. Intuitive's Board operated as a collective entity through periodic meetings held either in person or telephonically where the Board discussed matters affecting the Company's business and reached

1   collective and consensual decisions as to what action to take.

2        68.    Each of the Defendants aided and abetted and rendered substantial assistance in

3   the wrongs complained of herein. In taking such actions, as particularized herein, to substantially

4   assist the commission of the wrongdoing complained of, each Defendant acted with knowledge

5   of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and

6   was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The

7   Defendants' acts of aiding and abetting include, *inter alia*, the acts each of them are alleged to

8   have committed in furtherance of the conspiracy, common enterprise and common course of

9   conduct complained of herein.

10       69.    In addition to the duties described above, the Director Defendants had additional

11   duties as members of certain subcommittees of Intuitive's Board of Directors.

12       70.    Intuitive's Audit Committee is required to, among other things, monitor the

13   Company's compliance with legal and regulatory requirements and monitor "the integrity of the

14   Company's financial statements." The Audit Committee is further charged with reviewing "any

15   disclosure from the Company's CEO or CFO made in connection with the certification of the

16   Company's quarterly and annual reports filed with the SEC" for, among other things, "any fraud,

17   whether or not material, that involves management or other employees who have a significant

18   role in the Company's internal controls." The Audit Committee is also responsible for legal

19   compliance and risk management including review of "[l]egal compliance and legal matters that

20   could have a significant impact on the Company's financial statements" and "[a]ny material

21   reports or inquiries received from regulators, governmental agencies or employees that raise

22   material issues regarding the Company's financial statements and accounting or compliance

23   policies."   The Audit Committee is required to regularly report to the Board regarding the

24   "execution of its duties and responsibilities." In conjunction with these duties, the Audit

25   Committee has the authority to conduct any investigation appropriate to fulfilling these

26   responsibilities.

27                **SUBSTANTIVE ALLEGATIONS**

28   **I.**     **Background**

71.     Intuitive is a medical device company engaged in designing, building, selling and servicing robotic-controlled surgery devices. The Company conducted an initial public offering in 2000 when the Food and Drug Administration ("FDA") approved its sole product, the da Vinci Surgical System (hereinafter "da Vinci" or "da Vinci Surgical System"), for laparoscopic surgery. The FDA's initial approval was limited to certain procedures, such as gallbladder and gastroesophageal surgery.  In the years following, the FDA approved da Vinci for additional treatments, including thoracoscopic (chest) surgery, cardiac procedures performed with adjunctive incisions, as well as urologic, gynecologic, pediatric, and transoral otolaryngology surgeries.

72.     The da Vinci robotic system, with some variations as to accessories, remains Intuitive's sole product. Accordingly, Intuitive's revenue is solely generated from the da Vinci Surgical System. In 2012, revenues from sales of da Vinci Surgical Systems represented about 43% of the Company's overall revenue in 2012.  Each da Vinci Surgical System unit costs between $1.0 and $2.3 million. The rest was generated by "recurring revenue," which included sales of da Vinci Surgical System-related accessories (approximately $1,300 to $2,000 per procedure) and sales of annual service agreements (approximately $100,000 to $170,000 per system).

73.     As a Company whose entire business is the sale of a medical device, and its related accessories and services, that is designed to perform surgical procedures, the Company is subject to "extensive regulation" by the FDA:

> Because our products, including the *da Vinci* Surgical System, are commercially distributed, numerous quality and postmarket regulatory requirements apply, including the following:
>
> -   continued compliance to the QSR [Quality System Regulation], which requires manufacturers to follow elaborate design, testing, control, documentation and other quality assurance procedures during the development and manufacturing process;
>
> -   labeling regulations;
>
> -   the FDA's general prohibition against false or misleading statements in the labeling or promotion of products for unapproved or "off-label" uses;
>
> -   ***stringent complaint reporting and Medical Device Reporting regulations, which requires that manufacturers keep detailed records of investigations or***

*complaints against their devices and report to the FDA if their device may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if it were to recur;*

- adequate use of the Corrective and Preventative Actions process to identify and correct or prevent significant systematic failures of products or processes or in trends which suggest same; and

- *the reporting of Corrections and Removals, which requires that manufacturers report to the FDA recalls and field corrective actions taken to reduce a risk to health or to remedy a violation of the FFDCA that may pose a risk to health.*

We are subject to inspection and marketing surveillance by the FDA to determine our compliance with regulatory requirements. If the FDA finds that we have failed to comply, it can institute a wide variety of enforcement actions, ranging from inspectional observations (Form FDA 483) to a public Warning Letter to more severe civil and criminal sanctions including the seizure of our products and equipment or ban on the import or export of our products. *Our failure to comply with applicable requirements could lead to an enforcement action that may have an adverse effect on our financial condition and results of operation.*

SEC Form 10-K filed on Feb. 3, 2014.

74.     The da Vinci Surgical System is a medical device within the meaning of 21 U.S.C. §321(h). Through the Federal Food, Drug & Cosmetic Act, Congress empowered the FDA to require every manufacturer of a medical device to "establish and maintain such records, make such reports, and provide such information as the Secretary may by regulation reasonably require to assure that such device is not adulterated or misbranded and to otherwise assure its safety and effectiveness." 21 U.S.C. §360i(a). Pursuant to this broad delegation of authority, Congress created an expansive reporting system under which the FDA must require that every "device manufacturer . . . [file an MDR] whenever the manufacturer . . . receives or otherwise becomes aware of information that reasonably suggests that one of its marketed devices may have caused or contributed to a death or serious injury." *Id.* at §360i(a)(1)(A).

75.     The FDA has implemented Congress' mandate by issuing Medical Device Reporting ("MDR") regulations, 12 C.F.R. Part 803, which have remained essentially unchanged from 1997 until July 9, 2013, when the FDA proposed some changes in the regulations in a Notice of Proposed Rulemaking. Therefore, the medical device manufacturers' reporting

1   requirements under the MDR regulations have been well known to manufacturers in the medical

2   device industry for 14 years, including the period from October 2010 to the present.

3   **II.     Manner in Which the Company, Under Defendants' Stewardship, Violated Positive Law**

4

5          **A.     The Company Has an Obligation to Properly Report Da Vinci Surgical System Safety Incidents**

6          76.     The MDR reporting regulations allow the FDA to identify and monitor significant

7   adverse events involving medical devices. The purpose of MDRs is "to protect the public health

8   by helping to ensure that devices are not adulterated or misbranded and are safe and effective for

9   their intended use." 21 C.F.R. §803.1. MDRs are therefore critical to the FDA's ability to

10  monitor a device's performance and determine whether further FDA actions are necessary to

11  protect the public, including inspections of facilities, post-market studies, or requiring recalls of a

12  defective part of a medical device. MDRs filed with the FDA are compiled in the FDA's

13  Manufacturer and User Facility Device Experience (commonly known as and hereinafter

14  referred to as "MAUDE") database.

15         77.     The FDA places strict regulations on MDR reporting procedures because the vast

16  majority of MDRs – approximately 94% – received by the FDA are reported by the

17  manufacturer. "Adverse Event Reporting for Medical Devices," Department of Health & Human

18  Services, Office of the Inspector General, Oct. 2009 (finding that 94% of medical device adverse

19  event reports filed with the FDA were submitted by device manufacturers in 2007)

20  https://oig.hhs.gov/oei/reports/oei-01-08-00110.pdf.

21         78.     Pursuant to FDA regulations, when an adverse event related to a serious injury

22  occurs, user facilities, *e.g.*, hospitals, are required to report these injuries to the manufacturer:

23  "whenever a device user facility [*e.g.* hospitals] receives or otherwise becomes aware of …

24  information that reasonably suggests that a device has or ***may have caused or contributed to …***

25  ***serious injury to, a patient of the facility***… the facility shall … report the information to the

26  manufacturer." 21 U.S.C. §360i(b)(1)(B) (emphasis supplied); *see also* 21 C.F.R. §§803.30,

27  803.50. Manufacturers must then report to the FDA "no later than 30 calendar days after the day

28  that [the manufacturers] receive or otherwise become aware of information, from any source,

that reasonably suggests that a device that [the manufacturers] market: (1) *[m]ay have caused or contributed to a death or serious injury*; or (2) [h]as malfunctioned and this device or a similar device that [the manufacturers] market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." 21 C.F.R. §803.50(a).

79.    In addition to reporting the safety incident to the FDA, a medical device manufacturer is further obligated to investigate and understand the underlying causes of safety incidents. Manufacturers "are also responsible for conducting an investigation of each event and evaluating the cause of the event." 21 C.F.R. §803.50(b). If the original report is incomplete, the regulations require manufacturers to "provide a statement explaining why this information was incomplete and the steps [taken] to obtain the information." *Id.* And if the manufacturer later obtains information not available at the time it filed the initial report, it must file a supplemental report. *Id.*   All these legal requirements applied to Intuitive, since it is a medical device manufacturer.

### 1.    For Years, Intuitive Underreported Adverse Events

80.    As described in a medical journal study of Intuitive's reporting practices to the FDA, the Company underreported robotic surgery complications between January 2000 and August 2012. The study ("Underreporting of Robotic Surgery Complications") was published in the JOURNAL FOR HEALTHCARE QUALITY in September 2013 and was designed to test whether robotic surgery complications may be more common than represented in FDA adverse event reports. Michol A. Cooper, Andrew Ibrahim, Heather Lyu and Martin A. Makary, *Underreporting of Robotic Surgery Complications*, J.H.Q. (2013).

81.    The study cross-referenced MDRs in the MAUDE database with legal documents retrieved from LexisNexis and PACER. Of the 70 events found in the legal databases, over 10% had not been reported to the FDA, including deaths, perforations, and severe injuries. In five of the cases, no report was ever filed with the FDA. In two cases, the MDRs were filed only after the *Wall Street Journal* and *Reuters* reported the story – one of the MDRs "disputes the death" and only acknowledged that the patient suffered nerve damage. In a separate instance, even

1   though an Intuitive representative had been present during the surgery and witnessed the

2   patient's death, Intuitive still did not report it to the FDA.

3       82.     In addition to flagrantly failing to report deaths and other serious injuries to the

4   FDA, Intuitive also misclassified the injuries that it actually reported, in order to minimize their

5   import. On March 13, 2013, the Company issued a press release that was filed the following day

6   with the SEC on Form 8-K (the "March 13, 2013 Press Release"), admitting that until September

7   2012 the Company had been improperly classifying serious injuries as "other" in the MAUDE

8   database. After that date, Intuitive elevated previously classified events from "other" to the

9   correct category of "serious injury."

10      83.     Intuitive had thus admitted that until September 2012 the Company had been

11  underreporting "serious injuries" arising from da Vinci surgeries. The effect of the

12  reclassification was to almost double the number of serious injuries in 2012 to 131. Suntrust

13  Analyst Report, "ISRG-Thoughts on Updated Reporting Practices," dated March 14, 2013. The

14  Company has provided no explanation to this day for its failure to properly report serious injuries

15  and how serious injuries could possibly have been classified with the innocuous label of "other."

16      84.     The March 13, 2013 Press Release further admitted that the Company had not

17  been reporting MDRs properly to the FDA.  In a cryptic disclosure, it stated that in September

18  2012 it had "revised its MDR practices," which had then resulted in "increased reports."

19      85.     Once Intuitive began accurately classifying and reporting MDRs in September

20  2012, the number of MDRs in the MAUDE database skyrocketed. To evaluate the rise in defects

21  and injuries related to da Vinci, Plaintiff analyzed the MAUDE database that is publicly

22  available     from      the      FDA      website      (http://www.accessdata.fda.gov/scripts/cdrh/

23  cfdocs/cfmaude/search.cfm). For the twelve-year period from 2000-2012, there had been a total

24  of 4,603 da Vinci-related MDRs filed. This number grew dramatically (to over 9,839 MDRs),

25  after a staggering 5,236 da Vinci-related MDRs were filed with the FDA for the 2013 calendar

26  year. It is very difficult to discern how many of the 5,236 MDR filings over 2013 reflected

27  adverse events in that calendar year and how many were back-fill from the previous 2000-2012

28  period when Intuitive, under the direction of the Defendants, unlawfully concealed the adverse

events.  In any event, the astronomical number of MDR filings in 2013 alone represented more than a 100% increase over the MDR filings for the cumulative twelve-year period 2000-2012.

86.     The extent of Intuitive's cover-up is also evident in the monthly reporting figures. An average rate of over 400 MDRs a month filed during 2013 is ***more than five times higher*** than any prior period since da Vinci was introduced in 2000. The chart below, showing the number of MDRs submitted to the FDA on a monthly basis from January of 2000 through December 31, 2013, highlights the stunning increase after September 2012:



87.     Further, not only did the total number of MDRs grow on a large scale, so did those reporting "injuries" and "death." In October 2013 the number of "injury" and "death" type events swelled to almost 400 – more than triple the rate of any other month.

88.     In the three-month period from October 1, 2013 through January 31, 2014, 600 MDRs had been filed with the FDA. Most of these reports show a time lag between the event date and a date reported of six months to three years. In other words, the adverse events had taken place years before and not reported by Intuitive to the FDA.

89.     In addition to the securities complaint filed against the Company, as of Intuitive's most recent 10-K filing dated February 3, 2014, Intuitive was the subject of 76 individual

1  product liability lawsuits. In addition, Intuitive is also being sued by two of its insurers seeking

2  to rescind insurance policies based on Intuitive's alleged hiding of material facts about the legal

3  risks of the da Vinci robotic system.  Intuitive's 10-K dated February 3, 2014 at 33.  *See also*

4  Karen Gullo, *Intuitive Surgical Insurer Alleges Legal Claims Hidden*, BLOOMBERG (Oct. 31,

5  2013),        http://www.bloomberg.com/news/2013-10-31/intuitive-surgical-insurer-alleges-legal-

6  claims-hidden.html.

7         90.     The chart below visually demonstrates the massive increase in MAUDE "death"

8  and "injury" reports:



19        91.     Equally telling from this chart is the obvious increase in MDRs beginning in

20  November 2012 and the rapid acceleration thereafter. While "death" and "injury" reports

21  between August 2011 and August 2012 averaged about 10 per month, from September 2012

22  through December 2013 they averaged 62 per month, a more than *six-fold increase* as they

23  continued to rise and neared 1000 by October 2013. The increase reflects "injuries" and "deaths"

24  that had been concealed by Intuitive and are only being reported now. Intuitive had thus covered

25  up hundreds of "injuries" and "deaths."

26         **B.      The Company Has a Regulatory Obligation to Report Any Voluntary Recalls
              of the da Vinci to the FDA and a Common Law Duty Under Tort Law to Not
27            Permit a Dangerous Product Part on a Medical Device to Harm the
              Unsuspecting Public**

92.     Defects or failures of medical devices to perform as marketed can pose serious risks to public health. Recalls can both correct a defect in the medical device and notify users of potential risks and ways to minimize the impact of device failure or malfunction. A recall of a medical device can be initiated by one of three ways: (1) an order by the FDA pursuant to 21 C.F.R. §810, which is rarely used; (2) a request from the FDA pursuant to 21 C.F.R. §7.40; or (3) voluntarily by the manufacturer that becomes aware of a hazard or quality control issue with regard to its device.

93.     When a manufacturer voluntarily initiates a recall of its medical device because of a health risk posed by its device, it is required to inform the FDA of the recall and the reasons for it within 10 days of initiating the recall.  519(g) of the FDCA, 21 U.S.C. §360i(g) and 21 C.F.R. §806.10.  The regulations provide that the manufacturer must provide the FDA with a written report "of any correction or removal of a device initiated by such manufacturer or importer if the correction or removal was initiated [to] . . . reduce a risk to health posed by the device." 21 C.F.R. §806.10(a).

94.     The reasons for this important reporting requirement is to permit the FDA to coordinate with the manufacturer the recall communications and strategies so as to ensure the public health threat from the recalled product is minimized.  The FDA would determine what classification the recall falls under (Class I being the most serious) and how best to execute the recall (*e.g.*, depth of recall, content of communications, etc.) to monitor the safety of the product and to discharge its responsibility to protect the public health.

95.     In addition to complying with the Federal Food, Drug & Cosmetic Act and FDA regulations promulgated thereunder, Intuitive has a duty to comply with various state product liability laws.  Intuitive is exposed to tremendous legal risks for allowing a medical device into the marketplace that poses known risks to patients.  Director Defendants' fiduciary duty of good faith toward the Company they steward, includes taking reasonable steps to oversee the safety of the da Vinci products that they are selling and marketing.

### 1.     Da Vinci's Monopolar Scissors Caused Severe Injuries Due to Defective Tip Covers and Arcing

96.     The da Vinci Surgical System consists of several key components, including (i) an ergonomically designed console equipped with a high-definition, three-dimensional vision system where the surgeon sits while operating, (ii) a patient-side cart where the patient lays during surgery, (iii) three or four interactive robotic arms, (iv) proprietary EndoWrist® Instruments that attach to the robotic arms, and (v) a hardware console, which houses the computer operating system and software that controls the robotic arms. Together, these components allow surgeons to operate by manipulating a suite of tiny computer-assisted remote control tools through a small tube inside a patient.

97.     The EndoWrist Instruments are the part of da Vinci that actually cut and enter the patient's body. They are advertised on the Intuitive Surgical website as follows:

> Modeled after the human wrist, *EndoWrist* instruments can offer an even greater range of motion than the human hand. They truly allow the *da Vinci*® System to take surgical precision and techniques beyond the limits of the human hand. Similar to human tendons, an *EndoWrist* instrument's internal cables provide maximum responsiveness, allowing rapid and precise suturing, dissection and tissue manipulation.

98.     The EndoWrist Instruments include a number of endoscopic surgical parts used with da Vinci for a wide range of surgical tasks, such as tissue manipulation, suturing, cutting, coagulation, and clamping. Most instruments have an articulating design at the tips that enter the patient's body, known as a "wrist," which are designed to mimic the human hand and wrist-movements. These instruments have limited life-spans – each has an electronic tag which "expires" after a pre-determined number of uses.

99.     The most commonly used EndoWrist Instrument is the Hot Shears™ Monopolar Curved Scissors ("Monopolar Scissors"). According to a study entitled *Robotic Instrument Insulation Failure: Initial Report of a Potential Source of Patient Injury*, co-authored by Adam C. Mues, Geoffrey N. Box, and Ronney Abaza, and published in 2011 in the JOURNAL OF UROLOGY, 24 surgeons performed 454 robotic procedures between July 2008 and January 2009, and all of the procedures involved the Monopolar Scissors. The use of the Monopolar Scissors is prevalent because it allows doctors to both cut and cauterize tissue through a targeted electric discharge.

100.    To contain the electric current, Intuitive developed a rubber tip cover ("Tip Cover"). The Tip Cover is a silicon or rubber-like sleeve and is placed over the end of the Monopolar Scissors to insulate the instrument's metal parts and allow only the exposed electrode (the scissor blades) to emit electrical current to the intended area designated by the surgeon.

101.    "The Tip Cover plays a critical role in the robotic instrument" because it "serves as an insulation for the metallic segment of the EndoWrist and prevents broad dissipation of monopolar electric current," according to an article published in March 2011 by Yonsei University College of Medicine, entitled *Iliac Vein Injury Due to a Damaged Hot Shears Tip Cover During Robot Assisted Radical Prostatectomy*. If the Tip Cover functions properly, the article reported, "[i]t allows safe dissection in proximity to delicate structures such as blood vessels, nerves and bowel."

**Monopolar Scissors with Tip Cover Accessory**



**Damaged Tip Cover Accessory**



102.    The images of the Monopolar Scissors and the Tip Cover Accessory were published in "Robotic Instrument Insulation Failure: Initial Report of a Potential Source of

1   Patient Injury." Adam C. Mues, Geoffrey N. Box, and Ronney Abaza, J. OF UROLOGY 105

2   (2011).

3       103.    If the Tip Cover fails, however, electricity can escape the Monopolar Scissors and

4   electrical current can inadvertently be applied to adjacent tissue of the patient undergoing

5   surgery. This electrical current can burn or cause serious harm to patients. The burning is

6   commonly referred to as "arcing" because a visual arc of electricity is formed from the defect in

7   the insulated portion of the Tip Cover to another instrument or tissue. A patient's exposed tissue

8   is thereby burnt and injured.

9       104.    Even more severe injuries occur when the arcing is not in the field of vision of the

10  surgeon and therefore remains undetected. Since the surgeon operates the da Vinci remotely and

11  observes the surgery through a separate three-dimensional console rather than working directly

12  over the patient's body, the surgeon may not be aware that the malfunctioning Tip Cover is

13  burning the patient's tissue. Perforation of internal organs and blood vessels has caused internal

14  bleeding and severe injuries that were discovered days after the surgery, and only after the

15  patient's condition had deteriorated rapidly for unknown reasons. One such patient was Sonya

16  Melton. In an interview reported by CNBC on March 19, 2013 ("Robotic Surgery: Growing

17  Sales, but Growing Concerns") "[Sonya Melton] said she had become so sick almost

18  immediately after her surgery to remove uterine fibroids that she thought she was going to die.

19  Her condition, she said, puzzled doctors so much that within days they sliced her stomach open

20  to find out why she was in excruciating pain and had developed a full-fledged pneumonia. What

21  they found, she said, was a perforation in her small intestine." CNBC also reports that another

22  patient, Shawn Todd, said that her ureters, which carry urine from the kidneys to the bladder, had

23  been "burned."

24      105.    Other patients have died as a result of undetected burns. As reported by

25  *Bloomberg* on March 5, 2013, *Robosurgery Suits Detail Injuries as Death Reports Rise*,

26  Kimberley McCalla underwent surgery with da Vinci to treat early-stage cervical cancer on

27  August 12, 2010.  "Eleven days after the operation, she was rushed back into surgery, where

28  doctors found a laceration of the iliac artery near the original operation….The doctors sewed the

artery up, but it was too late. After two more emergency operations, Kimberley died on August 25, 2010 after suffering small bowel damage 'incompatible with life,' according to an operative report."

106.    The severe injuries suffered by Sonya Melton, Shawn Todd and Kimberley McCalla as a result of monopolar current appear to not be isolated cases.   A review of the MAUDE database shows that there was a substantial and material increase overall in injury and death-related MDRs in 2011, 2012 and 2013 when compared to prior years.

### 2.    Intuitive Knew of the Tip Cover Problems, Issued Recalls and Unlawfully Concealed the Recalls from the FDA

107.    Intuitive knew as early as October 2011 that the Tip Covers had a tendency to not insulate properly and allowed electricity to escape. On October 10, 2011, in response to complaints from hospitals for arcing through damaged tip covers that caused patient injuries, Intuitive sent out a letter to hospitals that used da Vinci systems warning that the Tip Covers were fragile, easily torn and required significant force to install, which often resulted in additional tears and fractures. Diana C.W. Friedman, Thomas S. Lendvay, and Blake Hannaford, *Instrument Failures for the da Vinci Surgical System: a Food and Drug Administration MAUDE Database Study, Surgical Endoscopy* (2013) 27:1507. The letter further stated that damaged Tip Covers cannot contain the electric current, causing arcing.

108.    Intuitive concealed this defect regarding Tip Covers from investors and the FDA. In violation of §519(g) of the FFDCA, 21 U.S.C. §360i(g) and 21 C.F.R. §806, the Reports of Corrections and Removals regulation, Intuitive failed to inform the FDA of this serious recall.

109.    On October 13, 2011, Intuitive sent out another letter to hospitals notifying them that da Vinci had not cleared for thyroidectomy procedures – *i.e*., the surgical removal of all or part of the thyroid gland. The reason this recall was necessary was because Intuitive had been engaging in actively marketing da Vinci for thyroidectomy procedures. Again, Intuitive failed to inform the FDA of either its off-label marketing activities or recalling da Vinci for such non-authorized surgery which Intuitive had marketed.

110.    On October 17, 2011, Intuitive sent yet a third letter to hospitals with information for inspecting instrument cannulas – *i.e.*, a hollow rigid tube inserted into the patient's body that allows the instruments on the robotic arms to access patients' anatomy through the small incisions. The letter warned that damaged Tip Covers due to defective cannulas were identified as "one of the root causes" for arcing that resulted in patient injuries.

111.    Again, Intuitive violated §519(g) of the FFDCA, 21 U.S.C. §360i(g) and 21 C.F.R. §806, the Reports of Corrections and Removals regulation, by failing to inform the FDA of this serious recall.

112.    It is a violation of the law, enacted to protect the health and safety of the American public, for a medical device manufacturing company, such as Intuitive, to try to "fly below the radar" and hide from the FDA the fact that its medical device was causing a health hazard that was so significant it had to issue a recall.

**III.    The Truth Comes Out**

113.    As will be further described (*infra* at ¶¶129-35) Intuitive's relationship with the FDA was strained since at least as early as ███████. This is not surprising, since, *inter alia*, Intuitive's gross underreporting and miscategorization of MDRs was coming to the attention of the FDA.

114.    In September 2012, the FDA met with Intuitive to discuss the Company's improper manner of reporting MDRs. As a result of this meeting, Intuitive was forced to change its reporting policies by: (1) correctly reporting adverse events resulting from da Vinci to the FDA, rather than concealing such events as had been its past practice; and (2) properly coding the events in the MAUDE system so that many more reporting incidents were correctly coded under "injury" or "serious injury," rather than this previous inaccurate and more benign category of "other."

115.    Not surprisingly, as a result of Intuitive's being forced to properly report adverse events from da Vinci, the number of da Vinci-related reports in the MAUDE system increased exponentially. See ¶¶85-91 *supra*. Until recently, this staggering increase in reported da Vinci-related defects, patient injuries, and deaths in 2013 alone – in comparison to the prior 12 years –

was hidden by Intuitive through its dramatic underreporting of MDRs.

116.   The substantial rise in MDR reports, as a result of the FDA's September 2012 meeting with Intuitive, triggered an FDA-initiated safety probe of the Company. Having been blindsided by Intuitive's bad-faith underreporting of adverse events, the FDA decided to get information about risks of the da Vinci directly from hospitals that purchased it and surgeons who used it.

> "What the agency is trying to determine is whether a rise seen in incident reports sent to the agency are 'a true reflection of problems' with the robots, or the result of other issues," said Syrim Rivers, an [FDA] spokeswoman, in an e-mail. "It is difficult to know why the reports have increased."

Robert Langreth, *Intuitive Robot Probe Threatens Trend-Setting Surgeries*, BLOOMBERG NEWS, March 1, 2013.

117.   Therefore, in January 2013, the FDA asked surgeons whose hospitals belong to the FDA's Medical Product Safety Network to participate in a 10-question telephone series about the da Vinci Surgical System. Surgeons were asked about user training, common equipment repairs, patient selection, the complications they encountered using da Vinci, and how they compared with those seen in conventional surgeries.

118.   Several news outlets, including Bloomberg News, publicly disclosed the FDA probe of Intuitive on February 28, 2013, five minutes before the stock market closed. This news was clearly recognized by investors as being seriously harmful to Intuitive. In those five minutes, the stock dropped $63, from $573 to $510 per share, costing the Company more than 10% of its value.

119.   Then, less than five months later, on July 16, 2013, Defendant Guthart received a stern "warning letter" from the FDA. (*See* Exh. A. attached to the Complaint). A warning letter – as its name implies – is a serious notice from the FDA to a company.  A "warning letter" is only issued if the FDA's earlier, less formal warnings to the company did not cause the company to come into compliance. The FDA defines a warning letter as follows:

> ...a correspondence that notifies regulated industry about violations that FDA has documented during its inspections or investigations. Typically, a Warning Letter notifies a responsible individual or firm that the Agency considers one or more products, practices, processes, or other activities to be in violation of the Federal

Food, Drug, and Cosmetic Act (the Act), its implementing regulations and other federal statutes. Warning Letters should only be issued for violations of regulatory significance, i.e., those that may actually lead to an enforcement action if the documented violations are not promptly and adequately corrected. A Warning Letter is one of the Agency's principal means of achieving prompt voluntary compliance with the Act.

FDA: Regulatory Procedures Manual, "Exhibit 4-1 Procedures for Clearing FDA Warning Letters and Untitled Letters," accessed March 2014.

120.    The July 16, 2013 warning letter cited Intuitive for numerous violations of the Federal Food, Drug & Cosmetic Act, 21 U.S.C. §321(h) and regulations promulgated thereunder for presenting a "risk to health posed by the [da Vinci device]" by concealing the October 2011 recalls from the FDA. More specifically, the warning letter addressed to Defendant Guthart stated:

> "[Y]ou informed our investigator that you are aware of patient injuries associated with intraoperative cleaning of energized instruments such as the Monopolar Curved Scissors and Fenestrated Bipolar Scissors as evidenced by at least **(b)(4)** complaints and 82 MDRs during calendar years 2010 and 2011, and 15% of the MDRs reviewed by our investigator. You also informed our investigator that you are aware that cleaning instruments inside patients during surgery is a common practice and have included a label warning in the Instructions-for-Use (IFU) against the practice. When our investigator asked you to provide the design input documentation and design resolution of this known user need you failed to provide the requested documentation."

121.    On July 18, 2013, Guthart publicly disclosed that Intuitive had received the FDA Warning Letter, and Intuitive's stock price declined by $28.81 on July 19, 2013 to close at $392.67. *Bloomberg*'s headline on July 20, 2013 said it all: "Intuitive Surgical Declines On Warning Letter From FDA." The article, written by Robert Langreth, focused on Intuitive's FDA reporting violations: "FDA inspections in April and May found a number of deficiencies, including that the [Sunnyvale, California-based] company in some cases hadn't adequately reported device corrections and patient adverse events."

122.    JP Morgan's July 19, 2013 report characterized the confluence of events resulting in the FDA Warning Letter as a "Perfect Storm." Likewise, an analyst report by Trefis that day said, the "company was dealt another blow in the form of a FDA warning letter, which could hinder approval of new products/procedures going forward." "The warning letter from the FDA will only worsen conditions as it will make it harder for the company to sell the system," it

1  continued.

2      123.   A subsequent Bloomberg headline that day also focused on Intuitive's lack of

3  candor with the FDA: "Intuitive Reeling as FDA Cites Lack of Visibility on Problems." It then

4  summed up the situation, stating: "Intuitive … has lost about $6 billion in value over five months

5  after disclosures about adverse events with its products, a recent recall, and now, a regulatory

6  warning it hasn't adequately reported on issues concerning the devices." In addition, a "review of

7  Food and Drug Administration records now shows the reports of injuries involving robot

8  procedures doubled in the first six months of 2013, compared with a year earlier."

9      124.   As a direct and proximate result of Intuitive's failure to comply with FDA

10 mandates, playing fast and loose with information about known risks of its product, and

11 concealing device-related complications of the da Vinci from the regulators, patients, doctors and

12 investors, Intuitive has suffered, and will continue to suffer a myriad of damages. Intuitive has

13 suffered reputational harm that has significantly damaged Intuitive's ability to sell the da Vinci

14 Surgical System as described above. Intuitive has incurred massive legal and other professional

15 service costs as described herein that were required to address the "crisis" Defendants created.

16     125.   Intuitive is currently the subject of a securities fraud class action, alleging that

17 Intuitive, Guthart, Mohr and Smith violated sections of the Securities Exchange Act of 1934, by

18 knowingly and recklessly misleading investors concerning Intuitive's business operations. This

19 class action is styled *Abrams v. Intuitive Surgical, Inc., et al.*, (N.D. Cal. 2013), and it will cause

20 Intuitive to incur defense costs and may result in a substantial adverse judgment against Intuitive.

21     126.   In addition, Intuitive is currently the subject of at least 76 personal injury lawsuits

22 according to Intuitive's 10-K filed February 3, 2014.

23 **IV.   What Individual Defendants Knew and When They Knew It**

24     A.   Defendants' Attendance at Board Meetings

25     127.   For brevity, Plaintiff has included a chart identifying which Individual Defendants

26 attended which Board meetings ███████████████████████ that can be

27 referenced to show what each Director Defendant knew about the Company's wrongdoing and

28 when he learned it.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



      **A.**      **The Board Minutes and Board Presentations Show Defendants Knew About and Blessed Intuitive's Systematic Violations of FDA Reporting Regulations**

1.  ███████████████████████████████████████

███████████

128.    Defendants flouted the FDA reporting requirements because, as they were keenly aware, doctors, hospitals and regulators watched MDR reporting closely and would react negatively to evidence of health risks by dialing back on purchases of the expensive da Vinci Surgical System. Furthermore, alerting the FDA to recalls and injuries caused by the da Vinci would further worsen Intuitive's chances to get favorable approvals from the FDA on pending new da Vinci accessories, applications, or expansion of approved surgeries for the da Vinci. "When determining whether or not to approve a device for new uses, one of the factors considered [by the FDA] are the reported device-related complications."  Michol A. Cooper, et al. (2013), *Underreporting of Robotic Surgery Complications*, JOURNAL FOR HEALTHCARE QUALITY 00, 1-5.

129.    █████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

130.    █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

131.    █████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

1

2

3

4    132.

5

6

7

8

9    133.

10

11

12

13

14    134.

15

16

17

18

19

20

21    135.

22

23

24

25

26    136.

27

28

1

2

3

4

5

6

7

8

9      137.   With the FDA's probe of Intuitive under way,

10

11

12

13

14     138.   By March, the public had received news of the tremendous increase in adverse

15  events and the FDA probe of Intuitive, and the Company stock had already begun to decline as a

16  result.

17

18

19

20

21

22

23     139.

24

25

26

27     140.   The reason for Defendants' obsessive focus on the public perception of da Vinci

28  as a safe method of performing surgery, is that patients, doctors and hospitals do not want to use

a dangerous surgical technique. Likewise, the FDA would be hostile to Intuitive's applications for approval of new accessories to da Vinci, and unlikely to permit da Vinci Surgical System to expand to different surgical uses, if it believed that the da Vinci Surgical System was not safe.

141.   As an equity analyst from Morgan Stanley observed in a July 17, 2013 report evaluating Intuitive's disappointing results: "We are less convinced a material change in the US CapEx [capital expenditure] environment explains the system shortfall in the quarter. Our 1Q and 2Q surveys showed a declining interest in robotics and hesitance to purchase a da Vinci despite a stable broader CapEx environment."   Put simply, hospitals were not reducing expenditures, as Defendant Guthart was desperately trying to persuade investors. They were just not buying da Vinci systems, and one of the reasons was the "safety of robotic surgery," as Morgan Stanley explained in a subsection entitled, "A Review of Recent Pressures on da Vinci Procedures."   Similarly, a July 9, 2013 Canaccord's report observed "This [the claim that hospitals had cut back] comes just three months after the company reported Q1/13 system sales that were quite strong (+24% Y/Y), making the magnitude and speed with which this negative deviation from historical placement growth trends unprecedented in the company's history. . . . We expect management to provide greater clarity on the factors impacting sales during the Q2 conference call on July 18, but for now we are left with many more questions than answers."

142.   An article published in Seeking Alpha on October 6, 2013, and entitled "Wait For The Next Shoe To Drop Before Buying Intuitive Surgical," succinctly summed up the impact of the FDA regulatory actions on Intuitive's common stock price:

> Intuitive Surgical (ISRG), the dominant manufacturer of robotic surgical devices, has had a difficult 2013 and its troubles may continue. . . . ISRG's woes are directly and almost exclusively due to the Food and Drug Administration ("FDA") warning letter and the related investigation into the efficacy, safety and use of the company's "da Vinci" surgical robot, which the company disclosed last quarter. . . . the company's development shall be stunted until the conclusion of FDA scrutiny. Hospitals will refrain from purchasing new da Vinci robots, whether or not they want or can afford them, while this overhanging regulatory concern persists. Hospital administrators are effectively handcuffed, which will restrict ISRG's near-term growth rates.

143.   ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

144. ████████████████████████████████████████████████

████████████████ including one lawyer specializing in "FDA and health care regulatory and compliance counseling experience in the areas of good manufacturing practice regulations, product recalls, product promotion, product diversion and counterfeiting, and fraud and abuse" [http://www.gibsondunn.com/lawyers/spayne] and another lawyer who "advises FDA-regulated companies, as well as hospitals and health care systems, facing government investigations and U.S. Food and Drug Administration (FDA) enforcement challenges." [http://www.skadden.com/professionals/jennifer-l-bragg].

145. According to Intuitive's 10-Q filed on July 22, 2013, the Company's "selling, general and administrative expenses" increased 20% for the three months preceding June 30, 2013 compared with the three months preceding June 30, 2012, in part due to "higher legal costs related to pending or threatened litigation."

**2.    Individual Defendants Knew Intuitive's Reporting Procedures Were Deficient and Either Consciously Disregarded Their Duty to Bring the Company into Compliance with Its Legal and Regulatory Obligations or Affirmatively Sanctioned the Unlawful Conduct**

146. Defendants knew since at least October 2010, that Intuitive's FDA reporting practices were improper because they were informed of those deficient practices in the course of

1   their duties as Directors of Intuitive. Yet, notwithstanding this knowledge, Defendants allowed

2   Intuitive to continue underreporting complications and adverse events caused by da Vinci, for

3   years, in breach of their fiduciary duties.

4          147.    At least two individuals who were direct reports to the Board, ███████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10  ████   ███████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████   In light of these

16  briefings, Defendants cannot deny their knowledge of Intuitive's reporting practices.

17         148.    As of ████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26

27  _____

    [3] ███

28  ███████████████████████

149. Guthart clearly knew about Intuitive's deficient reporting practices because, as CEO, he was charged with reporting on Intuitive's compliance with FDA regulations to the Board.

150.

151.

1    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

2    ■■■■■■■■■■■■■■■■■■■■■ As described above, one of those challenges was

3    Intuitive's pressing need to create a false impression concerning the safety of the da Vinci

4    Surgical System. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

5    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

6    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

7    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

8    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

9    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

10    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

11    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

12    ■■■■■■■■■■■■■■■■■.

13       152. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

14    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

15    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

16    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

17    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

18    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

19    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

20    ■■■■■■■■■■■■■■■■■■■■

21       153. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

22    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

23    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

24    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

25    ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

26    ■■■■■■■■■ *preceded* the September 2012 meeting between Intuitive executives and the FDA

27    where the FDA forced Intuitive to fairly and fully report adverse events. Therefore, the

28    Defendant Board members were aware of Intuitive's reputational risk and litigation exposure and

1    yet in conscious disregard of their duty of loyalty to the Company, did nothing to correct it prior

2    to being forced to by the FDA.

3          154.    ███████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   █████████████████████████████████████████

15         155.    ███████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████

24         **3.      The Board Knew About Dangers of the da Vinci's Tip Cover, and the
             Recalls and Yet Failed to Insist that the FDA Be Informed or that the**

25         **Dangerous Medical Device Be Appropriately Addressed**

26         156.    A December 31, 2013 *Bloomberg* article reconfirmed that a "Bloomberg review

27   of reports for operations with Intuitive's robotic system found dozens of injuries that went

28

1  unreported for years. Meanwhile, details of other patient problems involving use of the

2  company's product, cited in legal papers or in interviews with patients, were missing entirely."

3      157.  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████  Intuitive referred to these "WIN" goals as "Company Performance Goals" in its

8  most recent DEF 14A filing dated March 7, 2014. These goals are targets "established at the

9  corporate level and are drawn from the categories of procedure growth, system sales growth and

10  revenue growth, profitability, marketing objectives, customer training effectiveness, product

11  development, regulatory approvals and compliance, new product introductions, quality of design

12  and manufacture, applied research, and protecting intellectual property." Each goal is

13  individually weighted and executives are paid when the combined goals achieve a predetermined

14  "target level." ████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████

17      158.  The FDA classifies device recalls in increasing terms of severity ranging from

18  Class III (least severe) to Class I (most severe). A Class I recall results from a "dangerous or

19  defective product[] that predictably could cause serious health problems or death." A Class II

20  recall is the result of a "[p]roduct[] that might cause a temporary health problem"; and a Class III

21  recalls results from a product that is not likely to pose a significant health risk but nevertheless

22  violates      FDA      labeling      or      manufacturing      laws.      [http://www.fda.gov/

23  ForConsumers/ConsumerUpdates/ucm049070.htm].

24      159.  In the July 16, 2013 Warning Letter, the FDA stated that the recalls issued in

25  October 2011 were Class II recalls.

26      160.  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 and in fact the Company failed to comply with its regulatory obligation to inform the regulator of

9 its recalls.

10        161.   ████████████████████████████████████████████

11 ██████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████████

16 ██████████████████████████████████   ████████████████████

17 ██████████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████   there is no

24 indication ████████████   that the Board required the Company to take any steps to inform the

25 FDA of their concerns about the safety of the Tip Covers.

26        162.   ████████████████████████████████████████████

27 ██████████████████████████████████████████████████████████

28 ██████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 █████████████████████████████████ Capacitive coupling is a

5 technical term for the transfer of energy within an electrical network by means of the capacitance

6 (the ability to store electrical charge) between circuit readers. This is the exact problem that

7 caused the arcing or burning of patients' tissue resulting in serious injury or death. There is no

8 indication ██████████████████████████ asking any executive to make sure the

9 FDA is aware of this problem or of Intuitive's plans for remedying this problem.

10     163.    ████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 █████████████████████████████████ There is no indication that ████████

13 ████████████████████ took any action in light of that information.

**4.    Certain Defendants Benefited from the Misleading Impression They Created Concerning the Safety Record of the da Vinci Surgical System By Engaging in Insider Sales**

16     164.    As a result of their proprietary information about the mismanagement of the

17 Company and, further, the false and misleading statements discussed above, Guthart, Mohr and

18 Smith profited from Intuitive's artificially inflated stock through engaging in suspicious trading

19 activity. Guthart, Mohr and Smith ("Insider Trading Defendants") engaged in stock sales that

20 were suspiciously timed and dramatically out of line with their prior trading practices. Many of

21 these insider sales occurred shortly after the Company's undisclosed discussions with the FDA in

22 September 2012 regarding reporting requirements. Additional sales took place in late January

23 2013, just after the FDA commenced its MDR probe, but before such information was made

24 public, while Intuitive stock was trading at relative highs, and shortly before substantial declines

25 in the price of the stock, which Insider Trading Defendants knew would occur upon public

26 release of the proprietary information.

27     165.    To evaluate Defendants' selling activity, Plaintiffs used the publicly available

28 trading data that Insider Trading Defendants are required to report to the SEC on Form 4.

Plaintiffs analyzed the trading by Guthart, Mohr and Smith from February 6, 2012 through July 18, 2013 (the "Relevant Period") with an equal-length period immediately preceding the Relevant Period beginning August 26, 2010 and ending February 5, 2012 (the "Control Period"). The Form 4s filed during the Control Period and the Relevant Period are hereby incorporated by reference.

### a. The Nominal Amount and Percentage of Holdings Sold Were Extraordinary

166.    The unlawful sales by Guthart, Mohr and Smith are detailed in the charts below:

| Guthart's Trading Activity During Control Period: Aug. 26, 2010 through Feb. 5, 2012 | | | | | |
|---|---|---|---|---|---|
| **Date** | **Pursuant to 10b5?** | **No. of Shares** | **Price/Share** | **Total Proceeds from Sale** | **Total Holdings** |
| None | None | None | None | None | None |
| **Guthart's Trading Activity During Relevant Period: Feb. 6, 2012 through Jul. 18, 2013** | | | | | |
| **Date** | **Pursuant to 10b5?** | **No. of Shares** | **Price/Share** | **Total Proceeds from Sale** | **Holdings After Sale** |
| Apr. 20, 2012 | Yes[4] | 688 | $575.04[5] | $395,628 | 37,653 |
| Apr. 20, 2012 | Yes | 1,312 | $575.04 | $754,452 | 37,653 |
| Apr. 20, 2012 | Yes | 1,500 | $574.98 | $862,470 | 37,653 |
| Jul. 24, 2012 | Yes[6] | 2,000 | $473.47 | $946,940 | 37,653 |
| Jul. 26, 2012 | Yes[7] | 1,500 | $490.00 | $735,000 | 37,653 |
| Oct. 22, 2012 | Yes[8] | 1,500 | $542.98 | $814,470 | 37,653 |
| Oct. 22, 2012 | Yes | 1,000 | $545.63 | $545,630 | 37,653 |
| Oct. 22, 2012 | Yes | 2,000 | $544.48 | $1,088,960 | 37,653 |
| Jan. 25, 2013 | Yes[9] | 1,500 | $577.67 | $866,505 | 37,653 |
| Jan. 25, 2013 | Yes | 1,000 | $578.07 | $578,070 | 37,653 |
| Jan. 25, 2013 | Yes | 2,000 | $577.57 | $1,155,140 | 37,653 |
| **Total Proceeds From Sales During Relevant Period** | | | | $8,743,265 | |

| Mohr's Trading Activity During Control Period: Aug. 26, 2010 through Feb. 5, 2012 | | | | | |
|---|---|---|---|---|---|
| **Date** | **Pursuant** | **No. of** | **Price/Share** | **Total Value** | **Holdings After** |

---

[4]    Shares sold on April 20, 2012 were sold pursuant to Rule 10b5-1 Trading Plan, entered into on March 13, 2012.

[5]    Price per share taken from SEC Form 4.

[6]    Shares sold pursuant to Rule 10b5-1 Trading Plan, entered into on March 13, 2012.

[7]    Shares sold pursuant to Rule 10b5-1 Trading Plan, entered into on March 13, 2012.

[8]    All shares on Oct. 22, 2012 sold pursuant to Rule 10b5-1 Trading Plan, entered into on March 13, 2012.

[9]    All shares on Jan. 25, 2013 sold pursuant to Rule 10b5-1 Trading Plan, entered into on March 13, 2012.

| | to 10b5? | Shares | | | Sale |
|---|---|---|---|---|---|
| Feb. 1, 2011 | No | 100 | $335.28 | $33,528 | 2,448 |
| Feb. 1, 2011 | No | 300 | $335.26 | $100,578 | 2,148 |
| Feb. 1, 2011 | No | 300 | $335.25 | $100,575 | 1,848 |
| Feb. 1, 2011 | No | 100 | $335.08 | $33,508 | 1,748 |
| Feb. 1, 2011 | No | 185 | $335.01 | $61,977 | 1,563 |
| Feb. 1, 2011 | No | 717 | $335 | $240,195 | 846 |
| Feb. 10, 2011 | No | 1,000 | $335.75 | $335,750 | 4,846 |
| Feb. 10, 2011 | No | 100 | $335.79 | $33,579 | 4,746 |
| Feb. 10, 2011 | No | 100 | $335.78 | $33,578 | 4,646 |
| Feb. 10, 2011 | No | 200 | $335.77 | $67,154 | 4,446 |
| Feb. 10, 2011 | No | 100 | $335.70 | $33,570 | 4,346 |
| Feb. 10, 2011 | No | 100 | $335.68 | $33,568 | 4,246 |
| Feb. 10, 2011 | No | 100 | $335.65 | $33,565 | 4,146 |
| Feb. 10, 2011 | No | 100 | $335.56 | $33,556 | 4,046 |
| Feb. 10, 2011 | No | 100 | $335.44 | $33,544 | 3,946 |
| Feb. 10, 2011 | No | 100 | $335.31 | $33,531 | 3,846 |
| Feb. 10, 2011 | No | 100 | $335.23 | $33,523 | 3,746 |
| Feb. 10, 2011 | No | 2,900 | $335.20 | $972,080 | 846 |
| Jul. 22, 2011 | No | 9,298 | $403.51 | $3,751,836 | 1,088 |
| **Total Proceeds During Control Period** | | | | $5,999,195 | |

**Mohr's Trading Activity During Relevant Period: Feb. 6, 2012 through Jul. 18, 2013**

| Date | Pursuant to 10b5? | No. of Shares | Price/Share | Total Proceeds from Sale | Holdings After Sale |
|---|---|---|---|---|---|
| **Apr. 30, 2012** | Yes[10] | 2,200 | $583.07 | $1,282,754 | 1,191 |
| **Apr. 30, 2012** | Yes | 3,500 | $583.05 | $2,040,675 | 1,191 |
| Apr. 30, 2012 | Yes | 2,500 | $583.20 | $1,458,000 | 1,191 |
| Jul. 25, 2012 | Yes[11] | 3,300 | $478.58 | $1,579,314 | 1,191 |
| Oct. 22, 2012 | Yes[12] | 4,000 | $543.02 | $2,172,080 | 1,242 |
| Oct. 22, 2012 | Yes | 3,300 | $543.22 | $1,792,626 | 1,242 |
| Jan. 28, 2013 | Yes[13] | 3,200 | $574.12 | $1,837,184 | 1,242 |
| Jan. 28, 2013 | Yes | 3,600 | $574.57 | $2,068,452 | 1,242 |
| Jan. 28, 2013 | Yes | 1,200 | $574.57 | $689,484 | 1,242 |
| **Total Proceeds During Relevant Period** | | | | $14,920,569 | |

**Smith's Trading Activity During Control Period: Aug. 26, 2010 through Feb. 5, 2012**

| Date | Pursuant to 10b5? | No. of Shares | Price/Share | Total Proceeds from Sale | Holdings After |
|---|---|---|---|---|---|

---

[10]   Shares sold on April 30, 2012 pursuant to Rule 10b5-1 Trading Plan, entered into on March 13, 2012.

[11]   Shares sold on Jul. 25, 2012 pursuant to Rule 10b5-1Trading Plan, entered into on March 14, 2012.

[12]   Shares sold on Oct. 22, 2012 were sold pursuant to a Rule 10b5-1 Trading Plan, entered into on March 14, 2012.

[13]   Shares sold on Jan. 28, 2013 were sold pursuant to a Rule 10b5-1 Trading Plan, entered into on March 14, 2012.

| Jan. 27, 2011 | No | 400 | $334.81 | $133,924 | 423,780 |
|---|---|---|---|---|---|
| Jan. 27, 2011 | No | 6 | $334.78 | $2,009 | 423,774 |
| Jan. 27, 2011 | No | 300 | $334.79 | $100,437 | 423,474 |
| Jan. 27, 2011 | No | 100 | $334.79 | $33,479 | 423,374 |
| Jan. 27, 2011 | No | 200 | $334.80 | $66,960 | 423,174 |
| Jan. 27, 2011 | No | 100 | $334.82 | $33,482 | 423,074 |
| Jan. 27, 2011 | No | 450 | $334.84 | $150,678 | 422,624 |
| Jan. 27, 2011 | No | 500 | $334.95 | $167,475 | 422,024 |
| Jan. 27, 2011 | No | 100 | $336.20 | $33,620 | 422,024 |
| Jan. 27, 2011 | No | 2,144 | $336.33 | $721,092 | 419,880 |
| Jan. 27, 2011 | No | 200 | $336.56 | $67,312 | 419,680 |
| Jan. 27, 2011 | No | 500 | $336.65 | $168,325 | 419,180 |
| Jan. 27, 2011 | No | 1,000 | $336.68 | $336,680 | 418,180 |
| Jan. 27, 2011 | No | 5,000 | $336.90 | $1,684,500 | 413,180 |
| Jan. 27, 2011 | No | 2,000 | $337.01 | $674,020 | 411,180 |
| Jan. 27, 2011 | No | 2,000 | $337.14 | $674,280 | 409,180 |
| Apr. 26, 2011 | Yes[14] | 10,000 | $352.36 | $3,523,600 | 407,680 |
| Apr. 26, 2011 | Yes | 5,000 | $352.36 | $1,761,800 | 407,680 |
| Jul. 26, 2011 | Yes[15] | 15,000 | $397.12 | $5,956,800 | 327,336 |
| Oct. 25, 2011 | Yes[16] | 15,000 | $419.71 | $6,295,650 | 294,036 |
| **Total Proceeds During Control Period** | | | | $22,586,123 | |

**Smith's Trading Activity During Relevant Period: Feb. 6, 2012 through Jul. 18, 2013**

| Date | Pursuant to 10b5? | No. of Shares | Price/Share | Total Proceeds from Sale | Holdings After Sale |
|---|---|---|---|---|---|
| Apr. 20, 2012 | Yes[17] | 17,500 | $575.09 | $10,064,075 | 291,275 |
| Jul. 24, 2012 | Yes[18] | 12,500 | $473.18 | $5,914,750 | 274,775 |
| Jul. 24, 2012 | Yes | 5,000 | $473.18 | $2,365,900 | 274,775 |
| Oct. 22, 2012 | Yes[19] | 17,500 | $543.29 | $9,507,575 | 257,535 |
| Nov. 20, 2012 | No | 23,949 | $536.67 | $12,852,709 | 257,535 |
| Nov. 21, 2012 | No | 2,906 | $534.63 | $1,553,635 | 257,535 |
| Nov. 21, 2012 | No | 13,551 | $534.63 | $7,244,771 | 257,535 |
| Nov. 23, 2012 | No | 20,899 | $536.87 | $11,220,046 | 257,535 |

[14]   Apr. 26, 2011 shares sold pursuant to original 10b5-1 plan.
[15]   Options exercised/shares sold pursuant to 10b5-1 trading plan adopted by Smith on June 14, 2007.
[16]   Options exercised/shares sold pursuant to 10b5-1 trading plan adopted by Smith on June 14, 2007.
[17]   Shares sold pursuant to 10b5-1 Trading Plan adopted by Smith on March 8, 2012.
[18]   Shares sold pursuant to 10b5-1 Trading Plan adopted by Smith on March 8, 2012.
[19]   Shares sold pursuant to 10b5-1 Trading Plan adopted by Smith on March 8, 2012.

| Nov. 26, 2012 | No | 21,164 | $534.34 | $11,308,771 | 257,535 |
|---|---|---|---|---|---|
| Nov. 27, 2012 | No | 1,422 | $528.15 | $751,029.30 | 253,535 |
| Nov. 27, 2012 | No | 25,031 | $528.15 | $13,220,122 | 253,535 |
| Dec. 3, 2012 | No | 1,000 | $525.98 | $525,980 | 259,003 |
| Mar. 4, 2013 | Yes[20] | 13,750 | $541.43 | $7,444,663 | 241,213 |
| Mar. 4, 2013 | Yes | 11,250 | $541.43 | $6,091,088 | 241,213 |
| **Total Proceeds During Relevant Period** | | | | **$100,065,114** | |

#### b. The Stock Sales Were Inconsistent With Prior Trading Practices

167.   As shown above, the amount and percentage of shares sold during the Relevant Period by Insider Trading Defendants, Guthart, Mohr and Smith, were extraordinarily large and inconsistent with prior trading practices. Defendant Smith's sales during the Relevant Period totaled **$100,065,114**, which represented approximately 67% of the average number of shares he had available for sale during the Relevant Period.[21]

168.   Mohr sold 26,800 shares during the Relevant Period. He held 1,191 shares at the beginning of the Relevant Period and 1,242 shares at the end. Hence, his sales of 26,800 shares represent almost *22 times* his average shareholdings. Mohr practically sold every share that he acquired during the Relevant Period for proceeds of **$14,920,569**.

169.   Guthart's sales during the Relevant Period totaled **$8,743,265**, representing approximately *40% of the average number of shares he had available for sale during the Relevant Period*.

170.   In addition, Guthart's, Mohr's and Smith's sales also increased sharply, when compared with their trading practices during the Control Period.  During the Control Period, Guthart did not sell *a single share* of Company stock. Yet he sold approximately 16,000 shares, or *almost half of his average shares available for sale* during the Relevant Period. Smith more than tripled his sales, from 60,000 to nearly 190,000 shares. Mohr's share volume also increased

---

[20] Mar. 4, 2013 sales made pursuant to Rule 10b5-1 Trading Plan, entered into on Feb. 1, 2013.
[21] Average Share Price taken from average of adjusted closing prices from the Relevant Period: $518.36 (173,442 shares). Smith's average holdings were 259,610 through Relevant Period. 173,422.16/259,610 = approximately 67%.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT – Case No.                                                      49

significantly, from 16,000 shares to almost 27,000 shares. Collectively, Guthart's, Mohr's and Smith's sales increased almost **four-fold**, from approximately $28.5 million during the Control Period to almost $113 million during the Relevant Period.

### c.   The Timing of the Stock Sales Was Suspicious

171.    The Timing of the Stock Sales was also suspicious. Shortly after the September 2012 meeting with the FDA, which required the Company to begin reporting a substantial increase in MDRs, the Insider Trading Defendants sold over $70 million in shares: Guthart, $2,449,060; Mohr, $3,964,640; and Smith, $68,184,638.  The Insider Trading Defendants sold and profited on their proprietary information – that Intuitive's long run of fraudulently concealing "adverse events" from the MAUDE system was about to come to an abrupt end – before the impact of the new MDR reporting requirements would be made public and would negatively impact the stock price.

172.    ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ Guthart sold 4,500 shares on January 25, 2013, at an average of $577.77 per share. Mohr divested himself of 8,000 shares on January 28, 2013. These January 2013 transactions by Guthart and Mohr constituted their final sales of the Relevant Period and were executed at historic highs.

### d.   The Timing of the 10b5-1 Plans Adopted by Guthart, Mohr and Smith During the Relevant Period Is Suspicious

173.    Although some of Guthart's, Mohr's and Smith's stock sales were made pursuant to 10b5-1 Plans, the circumstances of those sales are extremely suspicious. For example, while all of Guthart's trades during the Relevant Period were made pursuant to a 10b5-1 Plan, that plan was enacted on March 13, 2012, over a month into the Relevant Period, and at a time when Guthart was already in possession of material, non-public information, as alleged herein.

174.    Mohr also executed a 10b5-1 Plan after the beginning of the Relevant Period, on March 13, 2012 (which he amended the next day, on March 14, 2012).

175.    Smith's behavior also appears to have been part of a concerted effort to take advantage of inside information. Smith originally enacted a 10b5-1 plan on June 14, 2007. Smith

then enacted a new 10b5-1 Plan only days prior to Guthart and Mohr, on March 8, 2012, approximately a month after the beginning of the Relevant Period, and transacted according to the plan on April 20, 2012, July 24, 2012, and October 22, 2012. As if the enactment of a 10b5-1 Plan after the start of the Relevant Period were not suspicious enough, Smith's trading evidences two other peculiarities: (i) the majority of Smiths Relevant Period transactions were not pursuant to his 10b5-1 Plan, and in fact those transactions correspond with the FDA's investigation of Intuitive, as discussed above, and (ii) Smith modified his 10b5-1 Plan later in the Relevant Period, on February 1, 2013 (pursuant to which he then sold additional shares).

**4.      In Furtherance of Their Scheme to Create a False Impression Concerning the Safety of the da Vinci Surgical System, Defendants Consciously Allowed Guthart, Mohr and Smith, and Intuitive to Make False and Misleading Statements to Investors in Violation of the Federal Securities Laws**

176.    Guthart, Mohr and Smith, and Intuitive, with the blessing of Defendants, repeatedly made materially false and misleading statements and omissions about the safety of da Vinci and Intuitive's compliance with FDA regulations. These statements and omissions were false and misleading because they touted the safety benefits of the da Vinci Surgical System but misleadingly failed to disclose: (i) Intuitive's regulatory violations, including the failure to report MDRs and recalls, (ii) da Vinci's defects and performance problems resulting in injury and death, (iii) the material rise in da Vinci adverse events. These false and misleading statements and omissions thereby concealed the severity and likelihood of the risks to health posed by da Vinci. The ultimate public disclosure of the true severity and likelihood of the risks to health had a negative and material impact in procedure growth, the financial results, and ultimately the Company's stock price.

177.    For example, on February 6, 2012, Intuitive's Form 10-K for the year ending December 31, 2011 (the "2011 Form 10-K") stated:

(a)      "[w]e believe that this new generation of surgery, which we call *da Vinci* Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery"; and

(b)    "The *da Vinci* Surgical System enables surgeons to extend the benefits of MIS to many patients typically receiving open surgery by using computational, robotic and imaging technologies to overcome many of the limitations of conventional minimally invasive surgery."

178.    Defendants caused the Company to continue its misinformation campaign in Intuitive's filings throughout 2012. In each Form 10-Q filed in 2012, the Company stated that da Vinci surgery represents "a new generation of surgery" that "combined the ***benefits*** of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery."

179.    In February 4, 2013, Intuitive filed its Form 10-K for the year ending December 31, 2012 (the "2012 Form 10-K"), Intuitive repeated the representations in [¶117], calling the "*da Vinci* Surgical Systems… a new generation of surgery" and touting it as "combin[ing] the benefits of minimally invasive surgery ("MIS") for patients with the ease of use, precision and dexterity of open surgery." Intuitive further represented that "[o]ver the past two decades, ***MIS ha[d] reduced trauma to the patient*** by allowing selected surgeries to be performed through small ports rather than large incisions, often ***resulting in shorter recovery time, fewer complications*** and reduced hospitalization costs."

180.    Each of the Director Defendants ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████

181.    The March 13, 2013 Press Release stated: "[i]n response to general inquiries regarding a recent rise in Medical Device Reports (MDR) filed by Intuitive Surgical, the company explained that the noted rise [did] not reflect a change in product performance but rather a change in MDR reporting practices." Intuitive further characterized the change in reporting practices as an "administrative change in how MDRs previously reported as adverse events were subcategorized. This change has not increased the total number of adverse event reports. This will result in an increase in events in the 'serious injury' subcategory and a

1    corresponding decrease in the 'other' subcategory. Total adverse event rates have remained low

2    and in line with historical trends."

3        182.    Intuitive's statements were materially false and misleading because they failed to

4    disclose that (1) Defendants were well aware of the significant safety issues with the da Vinci

5    instruments; (2) in 2012 there had been an enormous increase in MDRs related to product

6    performance compared to 2011, which exceeded "historical trends" and the increasing use of the

7    da Vinci products; and (3) that this increase in MDRs had caused the FDA to initiate a safety

8    probe to find the root cause for the increase and evaluate product performance.

9        183.    During Intuitive's April 18, 2013 earnings conference call, Guthart sought to

10   minimize the negative news and the numerous questions from analysts about the impact of the

11   FDA probe and issues with da Vinci. Guthart tried to discredit the negative reports by raising the

12   specter of a conspiracy: "we are in the midst of a concerted effort by critics of robotic surgery to

13   challenge the benefit it brings to patients." Guthart then effectively denied the validity of safety

14   concerns with da Vinci, further concealing the action Defendants had taken to hide the extent of

15   the actual problems. Guthart stated, "[w]e are confident that those who invest their time in a

16   serious review of the clinical literature on da Vinci will find ample evidence of the benefit it

17   brings to patients, surgeons, hospitals and the medical community at large. . . . In closing, da

18   Vinci surgery has proven safety, efficacy, economic and ergonomic benefits when compared to

19   the open surgical procedures it is replacing."

20       184.    Despite Guthart's efforts to preempt the analysts' concerns, the first question on

21   the April 18 earnings call related to the impact of the da Vinci safety issues on the number of

22   procedures. Evan Lodes from JP Morgan asked Guthart, "[C]an you desegregate the slowdown

23   in benign [hysterectomies] between the seasonal effects that you mentioned such as deductibles

24   and then also the more coordinated efforts that you talked with regards to the robot,

25   specifically?" Guthart admitted that the negative news had impacted the number of procedures,

26   although he was not able to quantify it: "negative press has some hard to measure impact on

27   benign hysterectomy.  Although it doesn't appear to be large, it's also probably not zero."

28

185.    Amit Hazan, from SunTrust Robinson Humphrey, then asked directly about the FDA probe: "[d]o you know anything about the report [referring to the FDA survey] that might be coming out with or you might be anticipating?" Guthart said, "We have no – nothing to share on that front," stopping himself short of apparently saying "we have no information."

186.    Guthart's statements were materially false and misleading because they denied the validity of the safety issues even though Guthart knew and failed to disclose that, (1) da Vinci posed a material health risk to patients; (2) da Vinci already had known defects; (3) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci; (4) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health by da Vinci that constituted Class II recalls; (5) the issuance of a substantial number of MDRs and complaints reporting material health risks to patients as a result of da Vinci in the three months between January 1, 2013 and March 31, 2013; (6) Intuitive had failed to report, or timely report, the adverse events through the MDR mechanism, as required by 21 C.F.R. §803.50; (7) the FDA had commenced a safety probe in January 2013 in response to the increase in number of da Vinci-related MDR reports; and (8) the FDA had commenced an inspection of Intuitive's facilities on April 1, 2013 during which numerous safety-related violations were found.

187.    On April 19, 2013, Intuitive filed its first quarter 2013 Form 10-Q for the period ending March 31, 2013 (the "1Q13 Form 10-Q"). In the 1Q13 Form 10-Q, the Company: (a) repeated the representations in Intuitive's 3Q12 Form 10-Q, set forth *supra* in [¶117], describing da Vinci as "a new generation of surgery" and touting its advantages of combining the benefits of both open surgery and MIS; and (b) reported that "during the first quarter of 2013, there have been articles published and papers written questioning patient safety and efficacy associated with *da Vinci* Surgery…We believe that *da Vinci* Surgery continues to be a safe and effective surgery method…"

188.    These statements were materially false and misleading because they denied the validity of the safety issues even though the Company knew and failed to disclose that, (1) da Vinci posed a material health risk to patients; (2) da Vinci already had known defects; (3)

1   Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken

2   by Intuitive to reduce health risks posed by da Vinci; (4) Intuitive had already undertaken three

3   secret field actions in October 2011 to reduce risks to health by da Vinci that constituted Class II

4   recalls, as determined by the FDA in its warning letter; (5) the issuance of a substantial number

5   of MDRs and complaints reporting material health risks to patients as a result of da Vinci in the

6   three months between January 1, 2013 and March 31, 2013; (6) Intuitive had failed to report, or

7   timely report, the adverse events through the MDR mechanism, as required by 21 C.F.R.

8   §803.50; (7) the FDA had commenced a safety probe in January 2013 in response to the increase

9   in number of da Vinci-related MDR reports; and (8) the FDA had commenced an inspection of

10   Intuitive's facilities on April 1, 2013 during which numerous safety-related violations were

11   found.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

13   189.   Plaintiff brings this action derivatively in the right and for the benefit of Intuitive

14   to redress injuries suffered and to be suffered by Intuitive because of the breaches of fiduciary

15   duty by Defendants. Plaintiff will adequately and fairly represent the interests of Intuitive and its

16   shareholders in enforcing and prosecuting its rights. Plaintiff was a shareholder at the time of the

17   conduct complained of herein and has continuously held shares of Intuitive to the present.

18   Plaintiff will remain a shareholder of Intuitive through the pendency of this action.

19   190.   Because of the facts set forth herein, Plaintiff has not made a demand on the

20   Board of Directors of Intuitive to institute this action against the Defendants. Such demand

21   would be a futile and useless act because the Board is incapable of making an independent and

22   disinterested decision to institute and vigorously prosecute this action.

23   191.   Each member of Intuitive's current nine-member board is a Defendant in this

24   action. Plaintiff would have to establish that a majority of defendants, *i.e.*, five, cannot exercise

25   independent objective judgment about whether to bring this action or whether to vigorously

26   prosecute this action. Demand on Intuitive's current Board of Directors to assert the claims

27   detailed in this Complaint on behalf of Intuitive would be futile because all nine members of

28   Intuitive's Board of Directors were complicit in the wrongdoing complained of herein.

192.   ███████████████████████████████████████

███████████████████████████████████████ Despite their knowledge, Defendants consciously allowed Guthart and Intuitive to make material misstatements to the public regarding the safety of the da Vinci Surgical System.

193.   Because of their participation in the gross dereliction of fiduciary duties, and breaches of duties of due care, good faith and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action. Accordingly, there is a clear need for Plaintiff to assert the claims herein and rectify Defendants' wrongdoing, and any demand would be futile.

194.   Each Intuitive Board member named is incapable of independently and disinterestedly considering demand to commence and vigorously prosecute this action.

      (a) Demand is futile with respect to Gary S. Guthart, Ph.D. because:

          i.   Guthart is personally and individually named in the securities fraud class action, *Abrams v. Intuitive Surgical, Inc., et al.*;

         ii.   As the Company readily admits, Guthart is not "independent" under its own standards or the standards of NASDAQ because of his financial entanglements with the Company;

       iii.   Guthart is Intuitive's CEO and made or caused the Company to issue false and misleading statements that misrepresented the safety of da Vinci products;

       iv.   Guthart was also a director from 2009 through the present, ███████ ██████████████████████████████████████ [22] and actively participated in the wrongdoing alleged;

         v.   Guthart was designated as one of the FDA's primary contacts;

       vi.   He faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein;

----

[22] ██████████████████████████████████████████████████████████████████████████

vii.  He received total compensation in excess of $5 million in 2012, to which he was not entitled and would be required to return to Intuitive;  and

viii.  He engaged in insider trading in the amount of $8 million and these ill-gotten gains properly belong to Intuitive.

(b)  Demand is futile with respect to Defendant Lonnie M. Smith because:

  i.  Smith is personally and individually named in the securities fraud class action, *Abrams v. Intuitive Surgical, Inc., et al.*;

  ii.  Smith has been designated as one of the FDA's primary contacts and was intimately familiar with Intuitive's wrongdoing;

  iii.  Smith has been a member of the Board since 1997 and Chairman since at least 2010, ████████████████████,[23] and actively participated in the wrongdoing alleged;

  iv.  Smith faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein;

  v.  As the Company readily admits, Smith is not "independent" under its own standards or the standards of NASDAQ because of his financial entanglements with the Company; and

  vi.  Smith received total compensation of $725,788 in 2012, to which he was not entitled and would be required to return to Intuitive; and

  vii.  Smith engaged in insider trading in the amount of $100 million and these ill-gotten gains properly belong to Intuitive.

(c)  Demand is futile with respect to Defendant Craig H. Barratt, Ph.D. because:

  i.  ████████████████████████████████████ ████████████████ As such, Barratt was regularly apprised of Intuitive's performance issues and regulatory problems, and either consciously disregarded his duty to see that the Company adhered to

---

[23] ████████████████████████████████████████

positive law or blessed the Company's strategy of violating the law. Barratt participated in or consciously tolerated the material misstatements made on behalf of Intuitive[24];

    ii.  Barratt faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein; and

    iii.  Barratt is a member of the Governance and Nominating Committee ███ ████████████████████████ As a member of the committee, Barratt is required to oversee the Company's adherence to applicable corporate governance principles and oversee the evaluation of the Board and management.

(d) Demand is futile with respect to Defendant Eric H. Halvorson because:

    i.  Halvorson has been a director since June 2003 ████████ ███████████████ As such, Halvorson was regularly apprised of Intuitive's performance issues and regulatory problems, and either consciously disregarded his duty to see that the Company adhered to positive law or blessed the Company's strategy of violating the law. Halvorson participated in or consciously tolerated the material misstatements made on behalf of Intuitive[25];

    ii.  Halvorson faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein;

    iii.  Halvorson is a member of the Audit Committee, ███████████ ██████████████ As a member of the Audit Committee, Halvorson is required to ensure the Company's compliance with legal and regulatory requirements and monitor "the integrity of the Company's

---

[24] ████████████████████████████████████████████████

[25] ████████████████████████████████████████████████

financial statements"; and

    iv. Halvorson is also Chair of the Compensation Committee ███████████

███████████████████ As a Chair of the Compensation

Committee, Halvorson was required to assist the Board in fulfilling its

oversight responsibilities in connection with executive compensation

matters.

(e) Demand is futile with respect to Defendant Amal M. Johnson because:

    i. Johnson has been a director since April 2010 ████████████

███████████████████ As such, Johnson was regularly

apprised of Intuitive's performance issues and regulatory problems, and

either consciously disregarded her duty to see that the Company adhered

to positive law or blessed the Company's strategy of violating the law.

Johnson participated in or consciously tolerated the material misstatements

made on behalf of Intuitive[26];

    ii. Johnson faces a substantial likelihood of liability for breach of fiduciary

duty claims asserted herein; and

    iii. Johnson is a member of the Compensation Committee ███████████

███████████████████ As a member of the Compensation

Committee, Johnson was required to assist the Board in fulfilling its

oversight responsibilities in connection with executive compensation

matters.

(f) Demand is futile with respect to Defendant Alan J. Levy, Ph.D. because:

    i. Levy has been a director since 2000 ██████████████

███████████████████ As such, Levy was regularly apprised of

Intuitive's performance issues and regulatory problems, and either

consciously disregarded his duty to see that the Company adhered to

[26] ████████████████████████████████████████████

███████████████████████████████

positive law or blessed the Company's strategy of violating the law. Levy participated in or consciously tolerated the material misstatements made on behalf of Intuitive[27];

    ii.  Levy faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein;

    iii.  Levy is Chair of the Governance and Nominating Committee ███████ ███████████████████████ █████[28] As Chair of the committee, Levy is required to oversee the Company's adherence to applicable corporate governance principles and oversee the evaluation of the Board and management; and

    iv.  Levy is also a member of the Compensation Committee ███████ ████████████████████████ As a member of the Compensation Committee, Levy is required to assist the Board in fulfilling its oversight responsibilities in connection with executive compensation matters.

(g) Demand is futile with respect to Defendant Floyd D. Loop, M.D. because:

    i.  Loop has been a director since 2005 ██████████████████████ █████████████████████████. As such, Loop was regularly apprised of Intuitive's performance issues and regulatory problems, and either consciously disregarded his duty to see that the Company adhered to positive law or blessed the Company's strategy of violating the law. Loop participated in or consciously tolerated the material misstatements made on behalf of Intuitive[29];

    ii.  Loop faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein; and

---

[27] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

iii.  Loop is a member of the Governance and Nominating Committee ███████

█████████████████████████████████ As a member of the committee,

Loop is required to oversee the Company's adherence to applicable

corporate governance principles and oversee the evaluation of the Board

and management.

(h)  Demand is futile with respect to Defendant Mark J. Rubash because:

i.  Rubash has been a director since October 2007 ████████████████

████████████████████ ████[30]  As such, Rubash was regularly

apprised of Intuitive's performance issues and regulatory problems, and

either consciously disregarded his duty to see that the Company adhered to

positive law or blessed the Company's strategy of violating the law.

Rubash participated in or consciously tolerated the material misstatements

made on behalf of Intuitive;

ii.  Rubash faces a substantial likelihood of liability for breach of fiduciary

duty claims asserted herein; and

iii.  Rubash is Chair of the Audit Committee ████████████████████

███████████. As Chair of the Audit Committee, Rubash is required

to ensure the Company's compliance with legal and regulatory

requirements and monitor "the integrity of the Company's financial

statements."

(i)  Demand is futile with respect to Defendant George J. Stalk, Jr. because:

i.  Stalk has been a director since 2007 ███████████████████

████████████████ ███.[31] As such, Stalk was regularly apprised of

Intuitive's performance issues and regulatory problems, and either

consciously disregarded his duty to see that the Company adhered to

[30] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

positive law or blessed the Company's strategy of violating the law.  Stalk participated in or consciously tolerated the material misstatements made on behalf of Intuitive;

ii.   Stalk faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein; and

iii.   Stalk is a member of the Audit Committee ████████████ ██████████  As a member of the Audit Committee, Stalk is required to ensure the Company's compliance with legal and regulatory requirements and monitor "the integrity of the Company's financial statements."

195.   Alternatively, in the event that Defendants disclaim being apprised of any issues with respect to Intuitive's MDR reporting, demand is futile because Defendants completely, consciously and utterly abandoned their obligation to remain informed about violations of law that were being perpetrated by Company executives by refusing to avail themselves of the reporting mechanisms in place. Intuitive's obligation to properly report adverse events was such a fundamental aspect of Intuitive's business that a Board member who was not aware of the manner in which Intuitive reported adverse events would be aware that he or she was not properly doing his or her job.  Similarly, an obligation of a medical device company, such as Intuitive, to not knowingly market, sell and service da Vinci with known defects that were hazardous to patients, is such a fundamental obligation that a Board member who did not question the existence of defects even though it was informed of "quality issues," rejection by European Union regulators and repeated recalls of the product, would be aware that (s)he was not properly doing his or her job in good faith.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

196.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

197. The Defendants each owe Intuitive and its investors fiduciary duties of loyalty, good faith, and due care in managing the Company's affairs.

198. As detailed above, the Defendants breached their fiduciary duties of loyalty and good faith by:

       a. Failing to in good faith see that Intuitive, its management and directors, complied with federal laws;

       b. Failing to rectify the material misstatements made to investors on behalf of Intuitive;

       c. Failing to in good faith attempt to see that Intuitive took all reasonable care to ensure that known product defects in its medical device product were corrected;

       d. Disseminating and/or allowing the dissemination of false statements/omissions; and

       e. Failing to prevent Guthart, Mohr and Smith from engaging in insider trading.

199. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Intuitive has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, the cost of defending Intuitive against a securities class action and multiple personal injury and/or product liability actions.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment)

200. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding and subsequent paragraphs, as though fully set forth herein.

201. By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense and detriment of Intuitive.

202. Plaintiff, as a shareholder and representative of Intuitive seeks restitution from each Defendant, and an order of this Court disgorging all profits, benefits, and other compensation obtained through wrongful breaches of fiduciary duties discussed herein.

## REQUEST FOR RELIEF

1    WHEREFORE, Plaintiff demands judgment as follows:

2    A.    Determining that this action is a proper derivative action maintainable under law,

3    and that demand is excused;

4    B.    Awarding, against all Defendants and in favor of Intuitive, the damages sustained

5    by the Company as a result of Defendants' breaches of their fiduciary duties;

6    C.    Awarding to Intuitive restitution from Defendants and ordering disgorgement of

7    all profits, benefits and other compensation obtained by the Defendants;

8    D.    Directing Intuitive to take all necessary actions to reform and improve its

9    corporate governance and internal procedures, to comply with the Company's existing

10   governance obligations and all applicable laws and to protect the Company and its investors from

11   a recurrence of the damaging events described herein;

12   E.    A clawback of compensation for board members and executives who were

13   involved in or approved the illegal activities detailed herein;

14   F.    Awarding to Plaintiff the costs and disbursements of the action, including

15   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

16   G.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

18   Plaintiff demands a trial by jury.

19

20   DATED:   March 21, 2014                     SCOTT+SCOTT,
                                                  ATTORNEYS AT LAW, LLP
21

22

23                                               /s/ Walter W. Noss
                                                 _____
24                                               WALTER W. NOSS

25                                               JOHN JASNOCH
                                                 707 Broadway, Suite 1000
26                                               San Diego, CA 92101
                                                 Telephone: 619/233-4565
27                                               619/233-0508 (fax)

28

SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
DAVID R. SCOTT
156 South Main Street
Colchester, CT 06415
Telephone: 860/537-5537
860/537-4432 (fax)

SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
JUDITH S. SCOLNICK
THOMAS L. LAUGHLIN IV
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174-4099
Telephone: 212/223-6444
212/223-6334 (fax)

*Counsel for Plaintiff*

## VERIFICATION

I, James D. Love, on behalf of City of Birmingham Relief and Retirement System ("Retirement System"), hereby declare and verify that the Retirement System is currently an owner of Intuitive Surgical, Inc. ("Intuitive") stock and has continuously been an owner of Intuitive stock since at least June 2007.

I have read the allegations of the Verified Shareholder Derivative Complaint and confirm that this action is not collusive and that the Retirement System is capable and willing to fairly and adequately represent the interest of shareholders who are similarly situated in enforcing the right of the corporation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of March, 2014, at Birmingham, Alabama.

City of Birmingham Relief and Retirement System

JAMES D. LOVE

Title:  Assistant City Attorney